Michael Buschbacher*
James R. Conde*
Laura B. Ruppalt*
Boyden Gray PLLC
801 17th Street NW, Suite 350
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
* *Pro hac vice* applications forthcoming

Eric Grant (Bar No. 151064)
Hicks Thomas LLP
701 University Avenue, Suite 106
Sacramento, California 95825
(916) 241-8414
grant@hicks-thomas.com

Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE; and ASSOCIATED EQUIPMENT DISTRIBUTORS,<br><br>       Plaintiffs,<br><br>       v.<br><br>STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board; and ROB BONTA, in his official capacity as the Attorney General of the State of California,<br><br>       Defendants. | No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1    Plaintiffs allege as follows:

2                                    **INTRODUCTION**

3       1.      Like everyone else, Californians rely on interstate rental trucks to move

4    within—and, increasingly, to exit—the state at affordable prices. *See, e.g.*, U-Haul

5    Growth States of 2022 ("California . . . saw the greatest net losses of one-way U-Haul

6    trucks"), https://perma.cc/Z9YU-YQLS. Small businesses and entrepreneurs rely on

7    rental vans and trucks to carry goods and services to and from California. And, of

8    course, trucks ship goods from California's ports across the country, keeping

9    interstate and international commerce flowing. Trucks, in short, have "profound

10   socioeconomic consequences" for our Nation. Vaclav Smil, *Energy and Civilization*

11   331 (2017). They are the "backbone of food deliveries, as well as a key link in the

12   distribution of industrial parts and manufactured goods." *Id.* Trucks and vans—and

13   the prosperity they enable—are virtually all powered by internal-combustion engines

14   that use abundant, energy-dense, liquid fuels.

15      2.      In 2020, however, the Governor of California set a "goal of the State":

16   eliminate all internal-combustion trucks and vans "by 2045." Exec. Order N-79-20

17   (Sept. 23, 2020), https://perma.cc/AXH9-V2CE. To achieve this "goal of the State,"

18   California's Air Resources Board (CARB) has come up with a plan. The plan orders

19   disfavored fleets with vehicles that cross into California, or service the state's ports

20   and railyards, to discard their internal-combustion vehicles and buy expensive,

21   heavy, and low-range trucks that use batteries instead of internal-combustion

22   engines. In other words, to gin up demand for electric trucks, CARB will simply

23   eliminate choice for disfavored fleets: buy electric, or else.

24      3.      "That is not the country the Framers of our Constitution envisioned."

25   *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 554 (2012). California's plan to

26   destroy choice will ripple across the U.S. economy and wreak havoc on interstate

27   commerce, all without Congress ever lifting a finger and, indeed, in defiance of federal

28   law.

4.      CARB calls this plan "Advanced Clean Fleets." But there's nothing particularly "advanced"—or, for that matter, "clean"—about the fleets required by CARB.

5.      If battery-electric trucks were "advanced," then private fleets would be buying them. Business reality is different. Battery-electric trucks cost far more, and perform far worse: They have a far lower range, payload capacity, and towing capacity than internal-combustion trucks. The batteries degrade over time, and their lifespan and residual resale value are highly uncertain. The infrastructure needed to charge the batteries is anemic and expensive, and if it ever gets built, it risks destabilizing an already fragile electric grid. Charging, when available, takes hours, not minutes. As in the days of the Pony Express, truck fleets using batteries will have to use relay services to transport freight long distances from California to other states.

6.      The supply chains for battery-electric trucks, moreover, rely heavily on digging earth and extracting and crushing rocks containing minerals, in the case of cobalt, using manual child labor. *See generally* Siddharth Kara, *Cobalt Red* (2023); Siddharth Kara (@siddharthkara), X, https://perma.cc/34MQ-WZCP. That's not "advanced."

7.      CARB would alternatively force fleets to buy hydrogen fuel-cell trucks, but that's a false choice. Fuel-cell trucks and vans are not commercially available. They also have no refueling infrastructure outside of a handful of stations in California, and hydrogen fuel may never be cost-competitive with liquid fuels. To date, the most famous "fuel-cell" truck remains the Nikola One "towed to the top of the hill" prior to filming for a promotional video of the so-called truck rolling downhill, using only the force of gravity, while its door was "taped during the photo shoot to prevent it from falling off." Nina Pulliano, *Electric Vehicle Startup Nikola Agrees to $125M Fraud Settlement* (Dec. 21, 2021), https://perma.cc/UVC9-9S3R;  Indictment ¶¶ 35, 36, *United States v. Milton*, No. 21-cr-478 (S.D.N.Y.). Nothing "advanced" about this option either.

8.   Despite this—or rather, *because of this*—CARB wants to use disfavored fleets as guinea pigs for the alternative vehicle market it seeks to decree into being. Through "Advanced Clean Fleets," CARB seeks to order disfavored fleet owners and operators to discard their working internal-combustion vehicles and replace them with 570,000 alternative powertrain trucks by 2045 (and by 2035 for drayage fleets), up from nearly zero today. That transition won't happen on the vast scale imagined by CARB. But the scramble to comply with a plan that defies the laws of physics, chemistry, and economics will be remarkably destructive.

9.   Consider the high-priority fleet rule's scope. It applies to fleets of moderate or large size, even if most of their vehicles or their income is earned elsewhere. It governs any truck or van that enters the Golden State—even for a single day. CARB will patrol California's state border for internal-combustion trucks that don't comply with its rule. Those vehicles must either accept CARB's suzerainty, turn back, or do their best to persuade CARB to issue a "five-day pass" allowing the truck to enter the state. The drayage truck rule applies to fleets of any size. If a truck enters a California seaport or railyard even one day a year, it will be banned from performing those services if it isn't electric by 2035.

10.   Many fleets have no choice. California has a territorial monopoly on the ports and the U.S. coastline needed to access the transpacific trade—its ports account for 70% of all U.S. containerized imports by weight. *See* Legislative Analyst's Office, *Overview of California's Ports* (Aug. 23, 2022), https://perma.cc/45XY-W62B. CARB will leverage this territorial monopoly to force a "'California knows best' economic philosophy" on interstate trucks, and the rest of the country. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 406–07 (2023) (Kavanaugh, J., concurring in part and dissenting in part).

11.   But fleets that do have a choice will seek to avoid California's borders, balkanizing the transportation of people and freight. "That is not," to repeat, the national arrangement that "the Framers adopted in Philadelphia in 1787." *Id.* at 407.

12.     It is also not the arrangement that Congress has adopted. As detailed below, California is defying "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Clean Air Act prohibits the relevant parts of Advanced Clean Fleets. 42 U.S.C. § 7543(a). So does the Energy Independence and Security Act. 49 U.S.C. § 32902(k). So does the Federal Aviation Administration Authorization Act. 49 U.S.C. § 14501(c). CARB must be enjoined.

## JURISDICTION AND VENUE

13.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 104 (1989).

14.     The claims asserted herein arise, *inter alia*, under 42 U.S.C. §§ 1983 and 7543(a) and 49 U.S.C. §§ 14501(c) and 32902(k).

15.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

16.     Venue in this judicial district is appropriate pursuant to 29 U.S.C. § 1391(b)(1)–(2) because Defendants reside in Sacramento, California and because the hearings and vote to adopt Advanced Clean Fleets occurred in Sacramento.

## PARTIES

### I.     Plaintiffs

17.     Formed in 2022, the American Free Enterprise Chamber of Commerce (AmFree) is a 501(c)(6) membership organization that represents hard-working entrepreneurs and businesses across all sectors. AmFree's members are vitally interested in the preservation of free markets, free innovation, and the continued economic viability of the internal-combustion engine in our transportation sector, along with the growth it enables. AmFree's members include fleet owners or operators regulated by the high-priority fleet rules and members that will suffer economic harm because of both the high-priority fleet rule and the drayage rule.

18.    Associated Equipment Distributors (AED) is an international trade association representing companies that sell, rent, service, and manufacture equipment used in construction, agriculture, mining, forestry, power generation, and industrial applications. AED's members are overwhelmingly small-to-medium-sized, family-owned companies. AED serves its members by opposing counterproductive regulations with one unified voice. AED's members, including those based in California, own fleets of service trucks to repair and maintain their customers' equipment. AED's members also rely on trucks to transport equipment to customers and job sites. Many of AED's members are regulated by the high-priority fleet rule or suffer economic harm because of both the high-priority fleet rule and the drayage rule.

## II.    Defendants

19.    Defendant Steven S. Cliff is the Executive Officer of the California Air Resources Board and its highest-ranking administrative officer. He is responsible for promulgating, implementing, and enforcing CARB's regulations, and he performs his official duties throughout the State of California. *See* Cal. Health & Safety Code §§ 39515, 39516. Executive Officer Cliff is sued solely in his official capacity.

20.    Defendant Rob Bonta is the Attorney General of California. He is responsible for enforcing CARB's regulations, and he performs his official duties throughout the State of California. Attorney General Bonta is sued solely in his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

21.    Three federal statutes govern this case, each individually preempting California's power grab: the Clean Air Act, the Energy Independence and Security Act of 2007, and the Federal Aviation Administration Authorization Act of 1994.

## I.    The Clean Air Act's Preemption of State Law

22.    Under Title II of the Clean Air Act, the Administrator of the U.S. Environmental Protection Agency (EPA) comprehensively controls emissions from

motor vehicles. "Before a manufacturer may introduce a new motor vehicle into commerce, it must obtain an EPA certificate indicating compliance with the requirements of the Act and applicable regulations." *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1146 (D.C. Cir. 2002); *see also* 42 U.S.C. § 7522(a)(1). EPA administers a testing program to certify new motor vehicles to national emissions standards, including in-use emissions standards applicable throughout the "useful life" of the vehicle, which vehicles must meet when "in actual use." 42 U.S.C. §§ 7521(a)(1), 7522(a)(1), 7525, 7541(a)(1), (b).

23.     Under § 202(a) of the Clean Air Act, EPA's primary regulatory authority, the Administrator of EPA must "prescribe . . . standards applicable to the emission of any air pollutant from . . . new motor vehicles or new motor vehicle engines which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). "Because greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant,' . . . EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). EPA, however, must set standards by "giving appropriate consideration to the cost of compliance within such period." 42 U.S.C. § 7521(a)(2).

24.     Pursuant to § 202, EPA sets technology-forcing emissions standards for trucks. That includes standards for emissions that contribute to soot and smog (i.e., ground-level ozone) in the ambient air, such as nitrogen dioxide, as well as greenhouse gas emissions that EPA has concluded contribute to climate change, such as carbon dioxide. *See, e.g.*, 88 Fed. Reg. 4296 (Jan. 24, 2023); 81 Fed. Reg. 73,478 (Oct. 25, 2016).

25.     "The cornerstone of Title II is Congress' continued express preemption of state regulation of automobile emissions." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. Dep't of Env't Conservation*, 17 F.3d 521, 526 (2d Cir. 1994). Specifically, § 209(a) of the Clean Air Act provides: "No State or any political subdivision thereof shall

adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment." 42 U.S.C. § 7543(a). Title II thus vests the national government with presumptively exclusive authority over new motor vehicle emissions, preventing "an anarchic patchwork of federal and state regulatory programs." *Motor Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979). By eliminating overlapping state and local regulations for motor vehicles, § 209(a) prevents a balkanized product market, lowers the cost of reducing emissions, and protects the "productive capacity of [the U.S.] population." 42 U.S.C. § 7401(b)(1).

26.    Congress authorized one narrow exception to the preemptive scope of § 209(a). EPA is authorized to "waive application of" § 209(a) for the State of California under certain, defined conditions. *See* 42 U.S.C. § 7543(b).

27.    To receive a waiver, California must first "determine[] that [its own] State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." *Id.* § 7543(b)(1). EPA "shall" then grant a waiver—but "[n]o such waiver shall be granted" if EPA "finds that":

> (A)    California's "determination . . . is arbitrary and capricious";
>
> (B)    California "does not need such . . . standards to meet compelling and extraordinary conditions"; <u>or</u>
>
> (C)    California's "standards and accompanying enforcement procedures are not consistent with section 7521(a) [202(a)] of this title," *id.* § 7543(b)(1), which requires sufficient lead time "to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period," *id.* § 7521(a)(2).

28.     Congress granted California this special treatment because more than 50 years ago it faced uniquely severe problems with "smog," or ground-level ozone, compared to other states. H.R. Rep. No. 90-728, at 22 (1967). California's "geography and prevailing wind patterns," combined with ample sunlight, made smog a persistent problem in the state. 49 Fed. Reg. 18,887, 18,890 (May 3, 1984) (citing 113 Cong. Reg. 30,948 (Nov. 2, 1967)); *see also* H.R. Rep. No. 90-728, at 22. When the waiver provision was enacted, "the air in the Los Angeles basin was so thick with smog that a mountain, or even a nearby mountain range, could simply disappear." *Coal. for Responsible Regul., Inc. v. EPA*, 2012 WL 6621785, at *3 (D.C. Cir. 2012) (Brown, J., dissenting from denial of rehearing en banc).

## II.     The Energy Independence and Security Act's "Maximum Feasible" Efficiency Standard

29.     In the Energy Independence and Security Act of 2007 (EISA), Congress directed the Secretary of Transportation to improve the fuel efficiency of trucks exceeding 8,500 pounds. "[I]n consultation with the Secretary of Energy and" EPA, the Secretary must establish a "fuel efficiency improvement program designed to achieve the maximum feasible improvement" for trucks. 49 U.S.C. § 32902(k)(2). The standards must be "appropriate, cost-effective, and technologically feasible." *Id.* § 32902(k). And the regulations "shall provide not less than—(A) 4 full model years of regulatory lead-time; and (B) 3 full model years of regulatory stability." *Id.* EISA therefore establishes a uniform program for improving the efficiency of the Nation's fleet of trucks.

30.     The Secretary of Transportation has delegated the duty to establish and administer this efficiency program to the Administrator of the National Highway Traffic and Safety Administration (NHTSA). *See* 49 U.S.C. § 322(b); 49 C.F.R. § 1.95(a).

31.     NHTSA has adopted stringent fuel-consumption standards for trucks. *See* 49 C.F.R. Part 535. The standards apply to each manufacturer's national fleet-

average fuel consumption, and there are different averaging sets for different types of vehicles. For example, a manufacturer's fleet of heavy-duty pickup trucks and vans is one averaging set. 49 C.F.R. § 535.5(a). Its fleet of truck tractors is a separate averaging set. *Id.* § 535.5(c). To minimize trade-offs that could have adverse effects on truck performance, NHTSA sets "attribute-based" standards. For example, the fuel-consumption target for heavy-duty pickup trucks and vans depends on a "work factor" that accounts for the need to maintain payload and towing capacity. *Id.* § 535.5(a)(2)(ii). The fuel-consumption target for tractors is based on gallons per 1,000 ton-miles, which accounts for the need to transport freight long distances. *Id.* § 535.5(c).

32.    NHTSA has adopted these rules in conjunction with EPA's regulation of carbon dioxide emissions because the "technologies available for improving fuel efficiency, and therefore for reducing both $CO_2$ emissions and fuel consumption, are one and the same." 76 Fed. Reg. 57,106, 57,110 (Sept. 15, 2011); *see also id.* at 57,124–25.

## III.    The Federal Aviation Administration Authorization Act's Preemption of State Law

33.    Recognizing that "a safe, sound, competitive, and fuel efficient motor carrier system is vital to the maintenance of a strong national economy and a strong national defense," Congress sought to "to reduce unnecessary [federal] regulation" of interstate trucking in the Motor Carrier Act of 1980. Pub. L. No. 96-296, §§ 2–3, 94 Stat. 793 (1980). The Act allowed motor carrier rates, routes, and services to be governed by market signals rather than by federal prescription.

34.    Fourteen years later, Congress similarly concluded that state regulation of motor carriers had "imposed an unreasonable burden on interstate commerce; . . . impeded the free flow of trade, traffic, and transportation of interstate commerce; and . . . placed an unreasonable cost on . . . American consumers." Pub. L. No. 103-305, § 601(a), 108 Stat. 1569, 1605 (1994). So, under the Federal Aviation Administration

1  Authorization Act of 1994 (F4A), Congress "sought to pre-empt state trucking

2  regulation." *Rowe v. N.H. Motor Transport Ass'n*, 552 U.S. 364, 368 (2008). The F4A

3  broadly provides that states "may not enact or enforce a law, regulation, or other

4  provision having the force and effect of law related to a price, route, or service of any

5  motor carrier . . . or any motor private carrier, broker, or freight forwarder with

6  respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

7      35.    The "overarching goal" of the F4A was to "assure transportation rates,

8  routes, and services that reflect 'maximum reliance on competitive market forces'"

9  and so "stimulate 'efficiency, innovation, and low prices,' as well as 'variety' and

10  'quality'" in the trucking industry. *Rowe*, 552 U.S. at 371 (quoting *Morales v. Trans

11  World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Preemption thus avoids "a patchwork

12  of state . . . regulations" and leaves decisions related to trucking rates, routes, and

13  services, "where federally unregulated, to the competitive marketplace." *Id.* at 373.

14      36.    Under the F4A, state laws or regulations "having a connection with, or

15  reference to carrier rates, routes, or services are pre-empted." *Id.* at 370 (cleaned up)

16  quoting *Morales*, 504 U.S. at 384). Preemption "may occur even if a state law's effect

17  on rates, routes or services is only indirect" and "occurs at least where state laws have

18  a 'significant impact' related to Congress' deregulatory and pre-emption-related

19  objectives." *Id.*, at 371 (quoting *Morales*, 504 U.S. at 386, 390).

**GENERAL ALLEGATIONS**

21      37.    Since the Clean Air Act was enacted, smog levels in Los Angeles have

22  fallen significantly.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///



38.     Over this period, smog-forming pollutants and particulate matter emissions from trucks and vans declined by roughly 99%, as emissions standards have tightened. Recent EPA standards will reduce new truck and van emissions by another "80 to 90 percent, or more." 88 Fed. Reg. at 4333. Trucks are now so clean that, according to CARB, 260 trucks are cleaner than a single train carrying the same cargo. CARB, *Draft Truck v. Train Emission Analysis*, https://perma.cc/G2M9-9VK2.

39.     The United States has some of the cleanest ambient air in the world. Even Los Angeles, despite its unique challenges, has ambient particulate levels that are lower than or similar to those of major European cities, including London, Berlin, or Paris. *See State of Global Air 2022, Health in Cities*, https://www.stateofglobalair.org/data-cities/#/air/plot.

40.     As the air in California has become cleaner, California has embraced a new regulatory paradigm. Cleaning up California's vastly improved ambient air is no longer enough. California's bureaucratic apparatus now seeks to confront "the climate change crisis." *See* Office of Gov. Gavin Newson, Exec. Order N-79-20 (Sept. 23, 2020).

41.     In an ostensive but misguided attempt to do so, California seeks to dictate the type of powertrains manufacturers must build, and consumers must buy. In particular, California aims to ban internal-combustion engines, which have powered trucks for over a century, and replace them with battery-electric or fuel-cell

powertrains. *Id.*

42.     CARB labels these alternative powertrains "zero emission," and the vehicles "ZEVs," for short. Cal. Code Regs. tit. 13, § 2015(b). Battery-electric vehicles, of course, don't have tailpipes, while fuel-cell vehicles emit only water vapor from the exhaust.

43.     But that doesn't mean they have no air pollutant emissions—producing the vehicles and the energy they need still results in significant emissions, and battery-electric vehicles increase particle emissions from tire wear, as they are far heavier than comparable conventional vehicles.

44.     Although California first focused on mandating ZEV powertrains in light-duty vehicles such as sedans and hatchbacks, it has now set its sights on the market for "heavy-duty" vehicles, including trucks and vans. Electrifying trucks, however, is a far different proposition from electrifying a commuter's luxury sedan.

**I.       California's Initial Assault on Trucks**

45.     Heavy-duty vehicles are vehicles with a gross vehicle weight rating (GVWR) of more than 8,500 lbs.  (GVWR means the weight specified by the manufacturer as the loaded weight of a single vehicle.) They include vehicles sometimes labeled as "medium-duty."

46.     Heavy-duty vehicles power America's commerce and economic growth. They include heavy pickup trucks, vans, box trucks, city buses, long-haul tractor trucks, refuse trucks, cement trucks, digger derricks, and more. Heavy-duty vehicles are often divided into classes by weight, with class 2b vehicles being the lightest, and class 8 vehicles being the heaviest. There are more than 14 million of these vehicles on the road today. Except for buses and passenger shuttles, heavy-duty vehicles are designed to do work such as carrying freight or towing heavy loads, not to transport persons short commuting distances.

47.     Given the weight and the wide range of duties these vehicles perform, they are not well-suited for electrification as a class.

48.     Nevertheless, in 2020, Governor Newsom set a "goal of the State that 100 percent of . . . heavy-duty vehicles in the State be zero-emission by 2045 for all operations where feasible and by 2035 for drayage trucks." Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/AXH9-V2CE. Governor Newsom also ordered CARB to promulgate rules for "heavy-duty vehicle regulations requiring increasing volumes of new zero-emission trucks and buses sold and operated in the State towards the target of 100 percent of the fleet transitioning to zero-emission vehicles by 2045 everywhere feasible and for all drayage trucks to be zero-emission by 2035." *Id.*

49.     Soon after, CARB adopted the "Advanced Clean Trucks" (ACT) rule. *See* CARB, Exec. Order R-20-004 (Jan. 26, 2021), https://perma.cc/UH4C-SPBA. Under ACT, vehicle manufacturers must meet annual production quotas of "zero-emission" vehicles as a percentage of their total heavy-duty vehicle deliveries in the state of California, or else buy "credits" from competitors that over-comply with their own percentage obligations. *See* Cal. Code Regs. tit. 13, § 1963.1.

50.     The ACT's schedule is as follows:

| Model Year | Class 2b-3 Group | Class 4-8 Group | Class 7-8 Tractors Group |
|---|---|---|---|
| 2024 | 5% | 9% | 5% |
| 2025 | 7% | 11% | 7% |
| 2026 | 10% | 13% | 10% |
| 2027 | 15% | 20% | 15% |
| 2028 | 20% | 30% | 20% |
| 2029 | 25% | 40% | 25% |
| 2030 | 30% | 50% | 30% |
| 2031 | 35% | 55% | 35% |
| 2032 | 40% | 60% | 40% |
| 2033 | 45% | 65% | 40% |
| 2034 | 50% | 70% | 40% |
| 2035 and beyond | 55% | 75% | 40% |

51.     In 2023, EPA granted a Clean Air Act waiver for ACT. 88 Fed. Reg. 20,688 (Apr. 6, 2023).

52.    EPA's waiver of Clean Air Act preemption for the ACT rule is currently being challenged in the D.C. Circuit, where the challenge has been stayed. *See Western States Trucking Ass'n, Inc. v. EPA*, No. 23-1143 (D.C. Cir.) and consolidated cases.

53.    ACT is not at issue in this case.

## II.    The "Advanced Clean Fleets" Rule

54.    Most consumers don't want to buy or use the battery-electric vehicles decreed by ACT. But instead of respecting consumer choice, CARB is colluding with truck and engine manufacturers by compelling disfavored fleet owners and operators to buy ZEVs made by manufacturers, thus attempting to procure for manufacturers a captive market.

55.    On August 28, 2023, CARB adopted the "Advanced Clean Fleets" rule (ACF). Exec. Order R-23-003, https://perma.cc/47QS-NUGY.

56.    ACF seeks to mandate demand for the ZEV trucks manufacturers must sell—indeed, ACF requires far more ZEV trucks to be purchased than manufacturers are obligated to sell under ACT.

57.    ACF became effective on October 1, 2023. Compliance deadlines are as early as January 1, 2024.

58.    ACF consists of four interlocking schemes that aim to prop up demand for ZEVs that truck and engine manufacturers have agreed to supply, and to artificially stimulate additional demand: (1) the high-priority and federal fleet rules, (2) a ban on model year 2036 and later internal-combustion engines, (3) requirements for drayage trucks, and (4) an electrification mandate for state and local fleets.

59.    Plaintiffs here challenge the "high-priority fleet" rule.

### A.    High-Priority Fleet Rule

60.    The high-priority fleet rule orders fleet owners and operators to replace their heavy-duty vehicles with battery-electric or fuel-cell vehicles on an aggressive timetable of CARB's choosing. The rule is extraterritorial, burdensome, and

impractical. It is riddled with exemptions that allow CARB to micro-manage fleets and play favorites, one vehicle at a time. And it is draconian when it comes to the penalties that will apply to fleets.

### 1.    The Rule's Extraterritorial Coverage

61.    The rule covers any entity that controls 50 or more vehicles anywhere in the world (not just in California) <u>or</u> $50 million in gross annual revenues (in the United States or abroad). Cal. Code Regs. tit. 13, § 2015(a)(1). Covered fleet owners include interstate entities renting or leasing vehicles for less than a year. *Id*. § 2015(b). It also includes motor carriers that hire and direct owner operators. *Id*. § 2015(a)(3).

62.    The rule, to be sure, applies only to the fleet owner or operator's "California fleet." But "California fleet" is defined expansively. An out-of-state vehicle "operated in California" for even a single calendar day becomes part of the California fleet—and remains so by operation of law for at least "two consecutive calendar years," even if the vehicle never again sets a wheel in the Golden State. *Id*. § 2015(a)(2), (*l*). To avoid placing California's fleets at a competitive disadvantage, therefore, the high-priority fleet rule covers vehicles sold outside of California, registered outside of California, that operate most of the time outside of California.

63.    Unsurprisingly, the high-priority fleet rule will regulate many heavy-duty vehicles registered or located outside of California, including interstate rental fleets, and trucks that occasionally travel through California to access goods shipped through the Pacific.

64.    By CARB's estimate, the high-priority fleet rule will ensnare about 350,000 vehicles, including 58,000 California-registered tractor cabs, and 50,000 out-of-state tractor cabs. App'x F, Emission Inventory and Results F-11 (Aug. 30, 2022), https://perma.cc/GC3N-AWSR. In other words, by CARB's estimate, the rule will regulate almost as many out-of-state as in-state tractor cabs.

///

## 2. The Rule's Burdensome Requirements

65. The high-priority fleet rule has two basic requirements.

66. **The certification requirement**: First, after January 1, 2024, any new or used internal combustion engine vehicle "added to [a] California fleet" must have a "2010 [or newer] . . . model year engine" and must comply with all "applicable California emissions standards," even if that vehicle is sold, titled, and registered outside of California and is fully compliant with applicable federal standards for its model year. Cal. Code Regs. tit. 13, § 2015(r).

67. Those standards include California's heavy-duty "Omnibus" rule, regulating nitrogen oxide and particulate matter emissions from heavy-duty vehicles. *See* CARB, Exec. Order R-21-007 (Sept. 9, 2021), https://perma.cc/U8JM-R9LL. California's "Omnibus" rule, however, has not received a waiver from EPA under § 209(b) of the Clean Air Act.

68. **The ZEV purchase requirement**: Second, fleets must overhaul their California fleet by discarding internal-combustion vehicles and purchasing ZEVs. The rule gives fleets two compliance options for transitioning to ZEVs. Cal. Code Regs. tit. 13, § 2015(d).

69. **Option 1.** Under the first option, beginning January 1, 2025, fleet owners must retire internal-combustion vehicles "by January 1 of the calendar year" after they exceed 800,000 miles or when "the engine model year is 18 years old or older, whichever occurs first." *Id.* § 2015.l(b). In other words, fleets must either scrap working trucks and vans, or sell them at a loss. Then, unless one of many convoluted waiver provisions applies, the retired vehicles may only be replaced by ZEVs. Indeed, as of January 1, fleet owners and operators using this option are already required to buy only ZEVs. *Id.* § 2015.1(a) ("Beginning January 1, 2024 . . . [a]ny new vehicle added to the California fleet must be a ZEV.").

70. A California fleet "remains in compliance" under the first option only if (1) "[n]o [internal combustion vehicles] were added to the California fleet on or after

January 1, 2024, with the exception of . . . vehicles purchased pursuant to an exemption or extension . . . or . . . vehicle[s] ordered prior to October 1, 2023"; <u>and</u> (2) "the [California] fleet has no [internal-combustion] vehicles . . . that were otherwise required to be removed . . . unless the . . . vehicle was granted an exemption or extension." *Id.* § 2015.1(b).

71.     **Option 2.** Under the second option, known as the "ZEV Milestones" option, "[b]eginning January 1, 2025," fleet owners must "continuously meet or exceed" specified "ZEV . . . percentage requirements" for their California fleets. *Id.* § 2015.2(a). The schedule depends on the type of vehicle, and is as follows:

| **ZEV Percentage** | **10%** | **25%** | **50%** | **75%** | **100%** |
|---|---|---|---|---|---|
| Milestone Group 1: Box trucks, vans, buses with two axles, yard tractors, light-duty package delivery vehicles | 2025 | 2028 | 2031 | 2033 | 2035 and beyond |
| Milestone Group 2: Work trucks, day cab tractors, pickup trucks, buses with three axles | 2027 | 2030 | 2033 | 2036 | 2039 and beyond |
| Milestone Group 3: Sleeper cab tractors and specialty vehicles | 2030 | 2033 | 2036 | 2039 | 2042 and beyond |

72.     For example, a California fleet composed of vans and box trucks must show that its vehicles are at least 10% ZEVs by 2025, 50% ZEVs by 2031, and 100% ZEVs by 2035. *Id.* § 2015.2(a).

73.     For purposes of compliance with the Milestones option, a vehicle "operated in California at any time during a calendar year" is "considered part of the California fleet for the entire calendar year," *id.* § 2015.2, and the applicable "Milestone percentage must be maintained each year until the next compliance milestone," *id.* § 2015.2(a).

///

74.     For fleets with vehicles in multiple groups (*e.g.*, box trucks and sleeper cabs), the required number of ZEVs "is calculated by counting the vehicles in the California fleet for each of the three Milestone Groups listed . . . then multiplying the number of vehicles in each Milestone Group by the ZEV percentage requirement for that year." *Id.* § 2015.1(b). "Any ZEV from any Milestone Group can be used to count toward the fleet's ZEV" requirement. *Id.* § 2015.1(c).

### 3.     Compliance for Interstate Rental Fleets

75.     The high-priority fleet rule is particularly problematic for rental fleets. Rental vehicles are often newer model year vehicles and so are already among the cleanest trucks on the road. There is no net-gain from forcing retirement of these newer, cleaner vehicles. Moreover, many customers rent trucks for infrequent long-distance travel to unfamiliar locations, use-cases for which electric trucks are particularly unsuited. The limited range of electric trucks will require rental customers to stop at least twice as often to recharge. *See infra* Part IV.B. And because they aren't returning nightly to a central depot where charging is available, customers will be forced to divert their routes to the few public charging stations capable of recharging large-capacity truck batteries. The long recharging times and circuitous routes will lengthen—by hours or days—the time necessary to complete a scheduled trip, increasing costs to the customer and reducing the vehicle's availability. The result will be more trucks on the road for longer times, leading to greater pollution (especially particulate matter emissions from tires and road wear, which are worsened by much heavier electric trucks), longer delivery times, and more expensive goods and services.

76.     The high-priority fleet rule is also incompatible with the way interstate rental companies operate. Interstate rental fleets cannot segregate a California fleet, as required by the rule, without fundamentally changing their business model. Today, a rental customer may pick up a truck in Portland, Oregon, drive through California for days, and return the truck in Phoenix, Arizona. Given this reality,

interstate rental fleets cannot determine their California fleet, except by monitoring their customers' every movement with GPS. And because even one day of travel within California suffices to subject a vehicle to the rule, interstate fleets will face particularly severe burdens.

77.     CARB offers interstate rental fleets another way to meet the ZEV Milestones option: The "Rental Vehicle Option." Instead of tracking the individual vehicles that make up a California fleet year-round, interstate rental fleets may "report the average number of rental vehicles that are operated in California" by providing CARB with "four quarterly snapshots" of California rental usage "on the first Monday after January 1, April 1, July 1, and October 1." Cal. Code Regs. tit. 13, § 2015.2(d). For purposes of the Rental Vehicle Option, "rental vehicles operated in California are those [1] that are in California, but are under contract to leave California; [2] vehicles to be picked up and dropped off in California; and [3] vehicles that are not under contract while in California on the date of the snapshot." *Id*.

78.     Fleets have a more Orwellian option to tally California vehicles. They may supply CARB with "telemetry data showing each rental vehicle that is in California on the snapshot dates," that is, GPS data pinpointing the location of each customer who travels through California. *Id*. Handing over that data, of course, would intrude into their customers' privacy. GPS monitoring, after all, "generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J, concurring).

79.     But in any event, the snapshot reporting "option" applies only to vehicles "rented fewer than 180 calendar days under contract with origins and destinations in California." Cal. Code Regs. tit. 13, § 2015.4(h). That is, California affords this "flexibility" only to rental trucks operating mostly *outside of California*.

80.     This option is also unworkable for rental fleets. Rental fleets must demonstrate compliance with the annual Milestone by February 1st, but they cannot

1  know their California fleet until the first Monday after October 1st, when the last
2  snapshot of the fleet is taken.

3       81.    California has confirmed that fleets must comply by guessing how many
4  renters will travel into California throughout the year, using their "projections" and
5  "experience." Exhibit A (attached hereto).

6       82.    Rental fleets, however, have no experience complying with any similar
7  program—CARB's rule is unprecedented. Fleets will have to guess, on pain of
8  significant penalties.

9                    **4.    The Exemptions**

10      83.    The high-priority fleet rule is unworkable. But instead of paring down
11  its ambition, CARB has riddled the rule with exemptions it will apply on a case-by-
12  case basis. Fleets may beg CARB for mercy if the rule doesn't work out, and CARB
13  may play favorites and micro-manage fleets one vehicle exception at a time. *Cf.* Carl
14  Schmitt, *Political Theology: Four Chapters on the Concept of Sovereignty* 5 (George
15  Schwab trans., 2005) (1922) (The sovereign is "he who decides on the state of
16  exception.").

17      84.    A fleet, for instance, may ask CARB for an exemption from the purchase
18  mandate if "no new [battery-electric vehicle] is available to purchase that can meet
19  the demonstrated daily usage needs of any existing vehicles of the same configuration
20  in the fleet." Cal. Code Regs. tit. 13, § 2015.3(b); *see also id.* §§ 2015.1(c)(2),
21  2015.2(f)(2). Or "if a needed configuration is not available to purchase as a ZEV or
22  [near-ZEV]" as established by CARB's "ZEV Purchase Exemption List" or through a
23  "ZEV Purchase Exemption Application." *Id.* § 2015.3(e); *see also id.* §§ 2015.1(c)(5),
24  2015.2(f)(5).

25      85.    The fleet's "needs" of course, are ultimately determined not by the
26  business judgment of the fleet owner or operator, but by CARB, and CARB has
27  already dictated some strict limits to fleet "needs." For example, according to CARB,
28  no one needs a tractor that travels more than 475 miles a day on a single charge.

CARB "will not approve" a "daily usage" exemption request if a battery-electric tractor "with a rated energy capacity of at least 1,000 kilowatt-hours"—a range of about 475 miles—"is available to purchase." *Id.* § 2015.3(b).

86.     That's fewer miles than what many drivers cover in a single shift, and far less than a team of drivers may cover in a single day. It is less than the distance from San Diego to Sacramento. Drivers that travel long distances will need to add several additional hours of charging time to their travel times, assuming they can find a working charger.

87.     Fleets may also ask for an extension of the deadlines for retiring internal-combustion vehicles. In some cases, CARB may grant an extension if fleet owners "experience delays due to circumstances beyond their control on a project to install ZEV fueling infrastructure." *Id.* § 2015.3(c); *see also id.* §§ 2015.1(c)(3), 2015.2(f)(3). Or if an ordered ZEV "cannot be delivered . . . by the next applicable compliance date due to circumstances beyond the fleet owner's control." *Id.* § 2015.3(d); *see also id.* §§ 2015.1(c)(4), 2015.2(f)(4). Or if a "manufacturer cancels a purchase agreement for ZEVs . . . due to circumstances beyond the control of the fleet owner." *Id.* § 2015.3(d)(2). Fleets will bear the burden of proof for every vehicle.

88.     Fleets may also buy a "backup vehicle" equipped with an internal-combustion engine—so long as they don't use it. These backup vehicles must be "operated less than 1,000 miles a year," and fleets "must submit [to CARB] odometer readings" as proof. *Id.* § 2015.3(a); *see also id.* §§ 2015.1(c)(1); 2015.2(f)(1). Truck manufacturers must be pleased with the wasteful stimulus.

89.     These exemptions show that CARB has no confidence that the rule will work. They also offer little solace—or help—to fleet owners and operators. They are unpredictable, illusory, and largely discretionary.

90.     Some supposed exemptions are unavailable—for example, CARB has yet to publish a list of unavailable vehicle configurations. *See id.* § 2015.3(e)(1). And in any event, this list wouldn't help much at all. "Available" doesn't mean "affordable."

Ferraris, Park Avenue penthouses, and private jets are all "available"—available, that is, to the few who can pay the high prices.

91.     Some exemptions are practically impossible to qualify for. Take the daily usage exemption. A fleet seeking to satisfy the Milestones option may only apply for the exemption if (1) "at least ten percent of [its] California fleet is [already] comprised of ZEVs or [near-ZEVs]," *id.* § 2015.3(b); and (2) "the next . . . [m]ilestone cannot be reached" by replacing any other vehicle in its fleet with a ZEV, *id.* § 2015.2(f)(2). To show the latter, the fleet owner must "request[] and obtain[] exemptions for all other [internal combustion engine vehicles] in [its] California fleet" before receiving a daily usage exemption. *Id.* But that is just the beginning of the process. The fleet must then submit telemetry data for "at least 30 consecutive workdays" tracking "daily mileage and energy use, and hours of operation . . . for *all* [internal-combustion] vehicles of the same weight class and configuration" in the fleet. *Id.* § 2015.3(b)(4) (emphasis added). And it must "[s]ubmit a description of the daily assignments or routes used by existing vehicle configurations" in the fleet and explain "why *all* [battery-electric vehicles] available to purchase of the same weight class and configuration" are unsuitable replacements, that is, why a ZEV replacement "cannot be charged or fueled during the workday at the depot, within one mile of the routes, . . . where ZEV fueling infrastructure is available" and "why charging could not be managed during driver rest periods or breaks during the workday." *Id.* § 2015.3(b)(5) (emphasis added).

92.     Or take the exemption for vehicle configurations that are unavailable. To apply for an exemption for a vehicle configuration not already on CARB's list, an owner must submit information about the vehicle to be replaced, including its "[m]ake, model, weight class, configuration"; information on "whether the vehicle has a crew cab, cabover, or all-wheel drive"; and "clear and legible photographs of the entire left and right sides of the vehicle with doors closed showing the vehicle's body configuration." *Id.* § 2015.3(e)(2)(A)(1). The owner "must also submit documentation

from two or more manufacturers" stating "the manufacturer does not offer for sale" a ZEV or near-ZEV "of the needed configuration." *Id.* § 2015.3(e)(2)(A)(2). Based on this and information CARB has gathered while administering other programs, CARB will "determine whether the configuration is available for purchase as a ZEV or [near-ZEV]" based on CARB's own "good engineering and business judgment" and a list of five criteria. *Id.* § 2015.3(e)(C), (D).

### 5.    The Penalties

93.    Covered fleet owners and operators that "fail to comply" with the high-priority fleet rule "may be subject to" unspecified "penalties." Cal. Code Regs. tit. 13, § 2015.6(b). CARB has refused to clarify what those penalties are. Nobody seems to know.

94.    CARB cites, or references, without elaborating, over 40 sections of the California Health and Safety Code as potentially imposing penalties. *Id.* § 2015.6 (end note). Some of those sections authorize CARB to impose administrative penalties, while others authorize civil or criminal fines amounting to tens of thousands of dollars per violation. *See id.* § 2015.6 (citing Cal. Health & Safety Code §§ 38580, 39674, 42400, 42400.1, 42400.2, 42402.2, 42410, 43016, 43023, 43154, 43211, 43212).

95.    The California Legislature requested policy recommendations for the regulation of vehicle fleets from CARB in 2018, but it has added no statutory authority specific to fleets. Cal. Health & Safety Code § 43018.8.

96.    CARB's claimed authority appears to derive from the Global Warming Solutions Act, and specifically from the Act's general grant of power to "adopt rules" in order "to achieve the maximum technologically feasible and cost-effective greenhouse gas emission reductions." Cal. Health & Safety Code § 38560. CARB derives its power to enforce these rules from § 38580, which in turn cross-references the penalty provisions of Article 3 of Chapter 4, Part 4, Division 26, of the Health and Safety Code (§§ 42400 through 42411).

///

97.     Some of the referenced penalty sections in Article 3 authorize prison terms. *See* Cal. Health & Safety Code § 42400(a) (providing that violators are "guilty of a misdemeanor and . . . subject to . . . imprisonment in the county jail for not more than six months"). Others authorize potentially enormous civil penalties for a violation. *See id.* §§ 42402.1(a), 42402.2(a), 42402.3(a) (penalties ranging from $25,000 to $75,000 per violation); *id.* §§ 42402.1(c), 42402.2(c), 42402.3(c) ("Each day during any portion of which a violation occurs is a separate offense.").

98.     The rules do not clearly explain which penalty provisions apply, or even what constitutes a "violation" of the rules for purposes of calculating a fine or a penalty. Regulated entities are left to contemplate what this means—and that's surely one of the points, as the potential penalties are astronomical. For example, one possibly applicable section provides for a penalty of up to $40,000 per violation if the person knew of the violation and failed to correct it, where "[e]ach day during any portion of which a violation occurs is a separate offense." *Id.* § 42402.2(a), (c). If this provision applies, then a fleet owner or operator who fails to replace one internal-combustion vehicle in its California fleet when the vehicle is due for retirement could be considered in violation for the entire year and liable for $14.6 million ($40,000/day for 365 days). CARB's failure to specify the penalties while leaving open the possibility of astronomical fines or jail time is a transparent attempt to bully fleets into compliance. Nice business you got there—shame if something should happen to it.

**B.     The Drayage Truck Rule**

99.     ACF also imposes burdensome new requirements on "owners and operators of on-road heavy-duty drayage trucks that operate at California seaports and intermodal railyards, drayage motor carriers and marine or seaport terminals, intermodal railyards and railyard and seaport authorities that operate in California." Cal. Code Regs. tit. 13, § 2014(a). Divided into two "Phases," the drayage truck rule forces owners to replace their drayage fleets with ZEVs, and requires that, by 2035, all drayage services in California be performed with ZEVs. *Id.* § 2014.1(a)(1)–(2).

100.    Under the drayage truck rule, starting December 31, 2023, owners are required to register all drayage trucks operating in California in CARB's Online Tracking System. *Id.* § 2014.1(a)(4)(A), (a)(8); *see also Truck Regulation Upload, Compliance and Reporting System (TRUCRS)*, CARB, https://ssl.arb.ca.gov/trucrs_reporting/login.php (last visited Mar. 27, 2024). Owners must update registration information for internal-combustion trucks annually, and only trucks registered with CARB may perform drayage services in the state. Cal. Code Regs. tit. 13, § 2014.1(a)(4)(B), (8)(A); *see also id.* § 2014.1(a)(6)(B) (prohibiting drayage service providers from contracting or dispatching unregistered drayage trucks).

101.    "Phase 1" began January 1, 2024, and requires "all drayage trucks registering in the CARB Online System [to] be zero-emission vehicles." *Id.* 2014.1(a)(1)(A). As a result, any additions to a drayage fleet (now or in the future) must be a ZEV. Starting January 1, *no* new or used internal-combustion drayage truck may be placed into service at California ports or railyards.

102.    To remain in service in California, every registered internal-combustion drayage truck "must visit a California seaport or intermodal railyard at least once each calendar year." *Id.* § 2014.1(a)(1)(B). If a truck does not visit a seaport or railyard in a calendar year, it will be removed from the CARB Online System and may not be re-registered. *Id.* § 2014.1(a)(1)(A)–(B). It is permanently out of service in California.

103.    "Beginning January 1, 2025," owners must retire any internal-combustion drayage truck that reaches its "minimum useful life threshold," which is generally the later of (1) "[t]hirteen years commencing from the model year that the engine and emissions control system in a vehicle was first certified for use by CARB or [EPA]"; or (2) "[t]he date that the vehicle exceeded 800,000 vehicle miles traveled or 18 years from the model year that the engine and emissions control system of that vehicle was first certified for use by CARB or [EPA] (whichever is earlier)." *Id.* §§ 2014(b), 2014.1(a)(1)(C). Any internal-combustion "drayage truck that exceeds its

1  minimum useful life threshold will be removed from the CARB Online System by
2  March 31 of each calendar year and can no longer provide drayage services in
3  California." *Id.* § 2014.1(a)(1)(C).

4      104.  Owners will have to find an out-of-state buyer for the internal-
5  combustion trucks forced out of their fleets: once sold, an internal-combustion truck
6  may not be re-registered in CARB's Online System, nor can registration for those
7  trucks "be transferred between truck owners." *Id.* § 2014.1(a)(8)(E)–(F).

8      105.  "Phase 2" begins January 1, 2035. At that time, "all drayage trucks in
9  the CARB Online System must be zero-emission vehicles and only zero-emission
10  drayage trucks can provide drayage service in California." *Id.* § 2014.1(a)(2). As a
11  result, by 2035, owners will have had to sell or decommission all internal-combustion
12  drayage trucks currently in their fleets.

13      106.  In limited circumstances, drayage truck owners may "apply" for CARB's
14  "approv[al]" to replace a "non-repairable" internal-combustion truck with another
15  internal-combustion truck of the same or newer vintage. *Id.* § 2014.1(a)(8)(H). But
16  the newer truck may be kept in service only until the "non-repairable vehicle would
17  have reached its minimum useful life threshold," forcing the owner, in many
18  instances, to sell or decommission the replacement well before it reaches the end of
19  its useful life. *Id.*

20      107.  Drayage truck owners may also request "extensions" to comply with the
21  rule if (1) the owner has ordered a ZEV whose delivery is delayed, or (2) the owner
22  "experience[s] delays due to circumstances beyond [his] control on a project to install
23  zero-emission vehicle fueling infrastructure." *Id.* § 2014.2.(a), (b). But the extensions
24  are not guaranteed—their grant is based on CARB staff's "good engineering
25  judgement." *Id.* § 2014.2(a)(5), (b)(1)(F), (b)(2)(A), (b)(2)(D). And owners are eligible
26  for an extension only if they have purchase or lease agreements for a replacement
27  ZEV in place, *id.* § 2014.2(a); they have executed contracts for installing ZEV fueling
28  infrastructure, *id.* § 2014.2(b)(1)(A), or a utility verifies it cannot electrify the

infrastructure site by the compliance deadline, *id*. § 2014.2(b)(2).

108.    CARB also enlists seaport and railyard staff to enforce the drayage truck rule. Beginning January 1, 2024, seaports and railyards must record every drayage truck that enters and provide that information to CARB "within 72 hours of a written or verbal request." *Id*. § 2014.1(a)(7). For any drayage truck that "is not compliant" with the drayage rule, the seaport or railyard must record information about the dispatching drayage motor carrier, the truck, and the operator, and report that information to CARB quarterly. *Id*. § 2014.1(a)(7)(C), (E), (G).

109.    Like covered fleet owners under the high-priority fleet rule, drayage truck owners and operators that "fail[] to comply" with the drayage truck rule "may be subject to" unspecified "penalties." *Id*. § 2014.3(a). And also like the high-priority fleet rule, CARB cites or references, without elaborating, over 40 sections of the California Health and Safety Code as potentially imposing penalties on non-compliant drayage truck owners and operators. *Id*. § 2014.3 (end note). Some of those sections authorize CARB to impose administrative penalties, while others authorize civil or criminal fines reaching tens of thousands of dollars per violation. *See id*. § 2014.3 (citing Cal. Health & Safety Code §§ 38580, 39674, 42400, 42400.1, 42400.2, 42402.2, 42410, 43016, 43023, 43154, 43211, 43212).

**C.    The 2036 Ban on Internal-Combustion Vehicles**

110.    ACF also imposes duties on vehicle manufacturers. "Beginning with the 2036 model year, all vehicles produced by manufacturers [of new heavy-duty vehicles] that are produced and delivered for sale . . . in California must be ZEVs." Cal. Code Regs. tit. 13, § 2016(c). In plain English, CARB bans new heavy-duty vehicles equipped with internal-combustion engines after 2035. That includes not just engines powered solely by gasoline, diesel, or renewable liquid fuels, but also plug-in hybrids, natural-gas vehicles, or hydrogen-fueled vehicles using internal-combustion engines.

111.    CARB picked this expiration date out of a hat. Initially, CARB proposed a ban by model year 2040. But CARB ultimately accelerated the start date to model

year 2036 to "sen[d] a stronger market signal indicating the end of combustion-powered sales in California." CARB, Final Statement of Reasons 15, 264 (Apr. 2023) (FSOR), https://perma.cc/8ZJD-NN5P. Of course, this is no "market signal": it's a government threat.

## III.    California's Waiver Application

112.    On November 15, 2023, less than two months before the first compliance deadline, CARB sought a waiver under the Clean Air Act for Advanced Clean Fleets. ACF Waiver Request, https://perma.cc/4YCF-GLWA.

113.    As it did during the rulemaking period, however, CARB refuses to concede that it needs a waiver to enforce the high-priority fleet rule. *Id.* at 19–21.

114.    According to CARB, the high-priority fleet rule "does not, on its face, require fleet owners/operators to purchase particular *new* motor vehicles. Rather, this element simply requires that fleet owners/operators add ZEVs to their fleets, and does not preclude such ZEVs from being used ZEVs." *Id.* at 20. CARB questions "whether this element is preempted and must be included in a waiver in order to be enforceable." *Id.* 20.

115.    CARB also claims that because the high-priority fleet rule may be met by purchasing only "post-sale vehicles, it is not preempted by section 209(a)." *Id.*

116.    CARB concedes, however, "that under current industry conditions"— anemic, non-existent sales of CARB's preferred powertrains—"it is unlikely that there will be sufficient numbers of either used ZEVs or NZEVs or engine or vehicle conversion kits to enable drayage and [high-priority] fleets to comply with applicable fleet requirements solely by utilizing post-new vehicle sales, or by shifting vehicles within fleets, especially in the first few years of the ACF's regulation's implementation." *Id.* Indeed, it is more than unlikely. It is certain.

## IV.    The Advanced Clean Fleets Rule Ignores Reality

117.    The high-priority fleet rule and the drayage rule ignore reality. These rules will have devastating effects on interstate fleets and the flow of commerce.

**A.    Demand for Heavy-Duty ZEVs Is Anemic**

118.    "In [model year] 2021, EPA certified only 1,163 heavy-duty ZEVs, or 0.2% percent of the [heavy-duty] vehicles." 88 Fed. Reg. 25,926, 25,940 (Apr. 27, 2023). Of these vehicles, only 89 were tractors.

119.    EPA did not certify any heavy-duty fuel-cell vehicles. *Id.*

120.    The majority of the heavy-duty ZEVs sold to date are battery-electric shuttles or buses purchased by politically motivated state and local governments and their instrumentalities, not private fleets subject to the discipline of market competition.

121.    Even after ACT, which mandates the production and delivery of ZEVs to California, as well as enormous fiscal subsidies from the state and the federal government, sales of new heavy-duty ZEVs in California remain low.

122.    In model year 2022, CARB reports that 11,809 class 7 and 8 tractors were delivered for sale in California. Of those, 218 (or 1.8%) were ZEVs, and only 106 ZEVs actually sold to an ultimate purchaser. *See* CARB, Advanced Clean Trucks Credit Summary Through the 2022 Model Year (Oct. 13, 2023), https://perma.cc/38GJ-JV44.

123.    According to the California Energy Commission, the total on-road fleet of medium- and heavy-duty ZEVs in California consists of 272 trucks, 1,708 buses, and 340 delivery vans; most of these vehicles are registered in high-density cities, such as San Francisco and Los Angeles. *Medium- and Heavy-Duty Zero-Emission Vehicles in California* (last updated June 5, 2023), https://perma.cc/Q3N4-PDUC.

124.    In California, there were only 100 class 8 tractor trucks in 2022, 68 of them in Los Angeles, and 22 in San Bernardino. *Id.*

125.    Yet CARB projects that over 1.6 million ZEV trucks will be on California's roads by 2050. ACF alone, by CARB's estimate, will mandate 570,000 ZEV sales by 2045, up from nearly zero today. CARB, Resolution 23-13, at 31, https://perma.cc/E5A3-EFNE.

126.   This is wishful thinking. As fleets are forced to scale up ZEV adoption, the rule will inevitably clash with reality. Fuel-cell trucks are not commercially available. And battery-electric vehicles, their infrastructure and supply chains, are simply not "advanced" enough to enable this ambitious fleet transition at the speed desired by CARB.

127.   The genesis of that clash is already apparent. Even CARB's mandates have not made production of heavy-duty electric vehicles commercially viable.

128.   Seven of the thirty-seven ZEV suppliers CARB identified in the rule have already gone bankrupt, liquidated their assets, or exited the heavy-duty electric vehicle business. *See generally* ACF Initial Statement of Reasons, App'x J, https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/acf22/appj.xlsm (Aug. 30, 2022); *see also* Prarthana Prakash, *British EV Maker, Once Valued at $13 Billion, Has Gone Into Bankruptcy Protection Without Making Any Sales*, Fortune (Feb. 6, 2024), https://perma.cc/7HYS-XCMD (Arrival);   Editorial, *Lightning eMotors to Liquidate Assets*, Metro (Feb. 7, 2024), https://perma.cc/5EM2-XL5W (Lightning eMotors); Ian Duncan, *Electric Buses Get Billions in Federal Aid. A Top Maker Just Went Bankrupt*, Wash. Post (Aug. 12, 2023), https://perma.cc/RYS8-QTPP (Proterra); Press Release, REV Grp., *REV Grp., Inc. to Exit School and Transit Bus Manufacturing* (Jan. 29, 2024), https://perma.cc/7K24-R4YS (REV-Collins and REV-ENC); Chris Randall, *Van Hool Announces Exit From Electric Bus Business and Faces Unclear Future*, Electrive (Mar. 12, 2024), https://perma.cc/8UB2-KCU3 (Van Hool); Press Release, AB Volvo, *Nova Bus Ends Production in the US* (June 21, 2023), https://perma.cc/YP2R-EPSH (Volvo-Nova Bus).

129.   Six others are in serious financial trouble. *See* Jason Hall & Tyler Crowe, *Beyond Canoo: A Pick-and-Shovel Play on the Growth of EVs and Mexico*, Yahoo! Fin. (Dec. 12, 2023), https://finance.yahoo.com/news/beyond-canoo-pick-shovel-play-145338770.html (Canoo); Peter Cohan, *Let Nikola Stock Fall As Bankruptcy Chances Hit 81% Per MicroAxis*, Forbes (Dec. 15, 2023),

https://www.forbes.com/sites/petercohan/2023/12/15/with-81-bankruptcy-chance-per-macroaxis-nikola-stock-is-not-cheap/?sh=517f49bf61f2 (Nikola); Kit Norton, *Rivian Lays Off 10% of Workforce As Lucid Production Underwhelms.*, Inv. Bus. Daily (Feb. 23, 2024), https://perma.cc/J65X-EBKK (Rivian); Press Release, Vicinity Motor Corp., *Vicinity Motor Corp. Receives NASDAQ Notification Letter Regarding Minimum Bid Price Deficiency* (Oct. 25, 2023), https://perma.cc/DLT4-4YVG (Vicinity Motor Corp.); The Canadian Press, *Lion Electric Lays Off 100 More Workers After $100-million Earnings Loss*, Fin. Post (Mar. 4, 2024), https://perma.cc/9CDB-HLM8 (Lion Electric); Eddie Pan, *Workhorse Layoffs 2024: What to Know About the Latest WKHS Job Cuts*, Investor Place (Mar. 12 2024), https://perma.cc/Z6FG-S36V (Workhorse).

130.    Two have been acquired by or merged with foreign companies. *See* Carla Westerheide, *Xos Will Merge With ElectraMeccanica*, Electrive (Jan. 16, 2024), https://perma.cc/8TQX-CC67 (XOS Trucks); News Release, Exro, *SEA Electric to Merge With Canadian EV Tech Firm* (Feb. 1, 2024), https://perma.cc/TQ3Y-U2SL (SEA Electric).

131.    Perhaps ACF will be a boon for the remaining suppliers, but it will cause fleet owners' purchase costs to skyrocket as they compete for the limited number of heavy-duty ZEVs trickling off the assembly line.

**B.    Battery-Electric Vehicles Are Not "Advanced"**

132.    CARB ignores, or downplays, the many downsides of the vehicles it is mandating for fleets. The reality is that battery-electric vehicles are not advanced enough to compete with conventional heavy-duty powertrains. Indeed, they are far behind.

133.    ***Expensive.*** Battery-electric trucks are expensive. Estimates vary, but by all accounts, battery-electric trucks are far more expensive upfront than comparable diesel engines. By one estimate, a typical diesel tractor day cab costs around $90,000, while a typical battery-electric truck costs around $230,000. Hoyu

Chong & Edward Rightor, *Closing the Trucking Gaps: Priorities for the Department of Energy's RD&D Portfolio*, Info. Tech. & Innovation Found. 12 (June 2023), https://perma.cc/773E-VVDR.

134.    According to another estimate, "a new Class 8 diesel truck tractor may cost roughly $135,000 - $150,000," while "the purchase price of a new Class 8 [battery-electric vehicle] can be as much as $450,000." Am. Transp. Rsch. Inst., *Understanding the $CO_2$ Impacts of Zero-Emission Trucks* 13 (May 2022), https://perma.cc/G7CG-VY5Z.

135.    By all reasonable estimates (i.e., not CARB's), the total cost of ownership of many battery-electric trucks remains greater, too, particularly when one accounts for their worse performance. Chong & Rightor, *supra*, at 14. According to Argonne National Laboratory, for example, battery-electric trucks "are nowhere near cost parity—adding over $1 million over the vehicle's lifetime—for Class 8 Sleeper Cabs in 2020." *Id*. at 15 (citing Argonne Nat'l Lab., *Comprehensive Total Cost of Ownership Quantification for Vehicles with Different Size Classes and Powertrains*, ANL/ESD/-21/4 (Apr. 2021)); *see also* Chad Hunter et al., *Spatial and Temporal Analysis of the Total Cost of Ownership for Class 8 Tractors and Class 4 Parcel Delivery Trucks*, NREL (Sept. 2021) (similar).

136.    Achieving cost-parity soon would require enormous subsidies from taxpayers, ratepayers, fuel producers, and internal-combustion vehicle buyers. That seems to be CARB's plan. But as explained below, even CARB's enormous fiscal and regulatory cross-subsidies won't achieve actual "parity," because ZEVs simply do not perform as well as internal-combustion vehicles.

137.    Batteries represent most of the upfront price of a ZEV truck, costing over three times more than a diesel engine. Chong & Rightor, *supra*, at 12. CARB assumes batteries will get far cheaper, but this is highly uncertain. Battery prices have fallen quickly. But that trend can't continue, and it has already stalled. Battery prices are now increasingly determined by the price of critical minerals needed to make them:

copper, lithium, cobalt, nickel, manganese, graphite, zinc, and rare earths. If anything, the evidence suggests battery minerals will become more expensive, as ore grades continue to decline globally, and global demand bids up the mineral prices. CARB has a bright and eager staff, but they are not experts in the future of global mineral prices.

138. Benchmark Minerals Intelligence, by contrast, does have expertise. Benchmark projects that some 384 new mines would need to be built over the next decade to satisfy demand for the minerals needed to make lithium-ion batteries. Benchmark Source, *More Than 300 New Mines Required to Meet Battery Demand by 2035* (Sep. 6, 2022), https://perma.cc/3F83-6WDP. The world is not building these mines. Minerals such as graphite (needed to make battery anodes) are already nearing a critical deficit, with a supply shortage of 777,000 tons predicted by 2030. China, which controls virtually all graphite (and most other minerals needed for batteries), has already imposed export controls. *See* Eric Onstad, *Auto Firms Race to Secure Non-Chinese Graphite for EVs as Shortages Loom*, Reuters (June 21, 2023), https://www.reuters.com/business/autos-transportation/auto-firms-race-secure-non-chinese-graphite-evs-shortages-loom-2023-06-21/.

139. For context, the American Transportation Research Institute estimates that electrifying California's trucks would require digging and processing more than 4 million tons of graphite, or 379.5.% of the world's current annual supply. It will also require 763,001 tons of cobalt (407.2% of annual global supply), 543,223 tons of lithium (492.8%) and 2,659,099 tons of nickel (89.3%). Am. Transp. Rsch. Inst., *Is California Ready for an Electric Vehicle Future*, https://perma.cc/MFR2-SM5E.

140. ***Low Range.*** Battery-electric vehicles have a lower range, and necessarily so. The amount of energy stored in the same volume or weight in gasoline or diesel is far greater.

141. Whether measured by volume or by weight, the difference in energy density is staggering:



142.   CARB asserts that battery-electric vehicles are about "four to five times as efficient" compared to internal-combustion vehicles. CARB, Resolution 23-13, at 11, https://perma.cc/E5A3-EFNE. What CARB means is that battery-electric vehicles use energy stored in the vehicle more efficiently than gasoline or diesel vehicles. Specifically, CARB claims "ZEVs can convert over 77 percent of the electrical energy from the grid to power whereas conventional gasoline vehicles only convert about 12 to 30 percent of the energy stored in gasoline to power at the wheels." *Id.*

143.   That exaggerates the efficiency of battery-electric vehicles, which is about 60% to 73%.

144.   It also ignores that most heavy-duty trucks use diesel engines, which are roughly 45% efficient.

145.   More important, it ignores the significant losses in efficiency required to produce and deliver energy to the battery in the first place. According to the Department of Energy, accounting for upstream losses cuts the efficiency of electric vehicles by nearly half. *Cf.* 88 Fed. Reg. 21,525 (Apr. 11, 2023) (estimating "a total electricity efficiency of 55.89%"). Once these upstream inefficiencies are accounted for, a hybrid, which is about 40% efficient, comes close to an electric vehicle, although it is far cheaper.

146.   But even on CARB's "tank-to-wheel" basis, the greater efficiency of a battery doesn't make up for the far lower energy density. Not even close. Compare, for example, the useful energy of an all-electric Tesla "semi," based on its "stated" efficiency and battery size, against the diesel Kenworth T680:



147.   Less useful energy stored on board the truck means a lower driving range.

148.   For example, a diesel tractor equipped with two standard 150-gallon diesel tanks may travel about 2,000 miles without refueling.

149.   Battery-electric trucks don't come close to matching this performance. For example, the Kenworth T680E has a range of 150 miles, the Peterbilt 579EV 150 miles, the Freightliner eCascadia 230 miles, and the Volvo VNR Electric 275 miles. Chong & Rightor, *supra*, at 8–9. ZEV trucks will therefore require refueling far more often. And batteries will degrade over time by about 20% or more, so range will get worse with age.

150.   ***Lower Payload.*** For heavy-duty vehicles, *gravimetric* energy density matters. Tractors are used to carry freight, and the more they weigh, the less freight they can carry.

151.   That's a problem because batteries are also far heavier per unit of energy than a simple diesel fuel tank.

152. By one comparison, an unloaded, fully fueled conventional sleeper cab truck weighs about 18,000 pounds, while an unloaded ZEV with a battery allowing a sufficient range to meet most needs (568–710 miles) would weigh about 32,000 pounds. Am. Transp. Rsch. Inst., *Understanding the CO$_2$ Impacts*, *supra*, at 18.

153. Heavy-duty trucks have a maximum safe operating weight on the highway, depending on the number of axles. For a six-axle truck, that's 80,000 pounds, although ZEVs are given a special 2,000-pound allowance. Cal. Veh. Code § 35551(f); 23 U.S.C. § 127(s).

154. The 2,000-pound allowance doesn't make up for the low gravimetric density of batteries. Not even close. To achieve a range that's roughly close to a typical Class 8 tractor cab (1,440 miles), a truck battery would have to weigh over 24,000 pounds, about three times the weight of the diesel truck engine. Because much of the allowed gross vehicle weight is used up by the battery, this would reduce payload by 18,000 pounds. Chong & Rightor, *supra*, at 11. Or using an estimate from a ZEV with a shorter range, a ZEV with a range exceeding 568 miles would reduce payload by about 12,000 pounds. Am. Transp. Rsch. Inst., *Understanding the CO$_2$ Impacts*, *supra*, at 18. In the freight business, every pound of freight matters. A difference of roughly 10,000 pounds per truck is unacceptable.

155. Moreover, ZEV trucks face a significant dilemma: the more battery range, all other things equal, the bigger the battery, but the lower the truck's payload capacity.

156. Because electric vehicles have lower payloads, total vehicle miles travelled to haul freight will have to go up, increasing traffic congestion and fatalities. Or freight-tons moved will have to go down, harming the productive economy as trade falls.

157. Toyota, for example, will have to increase truck trips by 20% in order to carry the same number of cars using a battery-electric hauler truck, increasing delivery costs. *Comments of Toyota*, 200-45d, at 2 (Oct. 14, 2022), https://perma.cc/

LYM5-DG9Z. Electrifying hauler trucks would add an estimated additional 5,000 to 8,000 pounds, causing haulers to exceed their weight limits, and therefore requiring manufacturers to reduce the number of passenger cars hauled by a truck from nine to seven. *Comments of Am. Trucking Assn's & Cal. Trucking Assn.*, 282-45d, at 13 (Oct. 17, 2022), https://perma.cc/2EKT-3T29.

158.    CARB doesn't include lost payload in its economic analysis.

159.    ***Long Refueling Times.*** Filling up a gasoline or diesel truck takes a few minutes. Recharging a battery-electric truck takes much longer—several hours, depending on the charger and the size of the battery.

160.    Long refueling times mean losses in productive economic activity. According to comments from motor carriers, this will cut productive on-duty maximum driver hours by about a quarter. By one estimate, ZEV charging will consume 480 hours of a driver's time annually. *Comments of California Trucking Ass'n & Western States Trucking Ass'n*, 290-45d, at 5 (Oct. 17, 2022), https://perma.cc/ WPA8-AZGF. It also increases infrastructure costs, as it means more charging stations—and more space, more power lines, etc.—are needed at every waystation to "refuel" these vehicles.

161.    CARB ignores time lost recharging in its economic analysis.

162.    ***Inadequate Charging Infrastructure.*** The infrastructure needed to charge heavy-duty vehicles doesn't exist.

163.    The power needs of heavy-duty trucks are far greater than the needs of electric sedans. Fast-charging a long-haul truck requires approximately 1 megawatt, which is about seven times the power required to charge a passenger car. A freeway station designed to charge these vehicles "may need upwards of 19 MW. That's enough power for 14,250 homes." Chong & Rightor, *supra*, at 15.

164.    There are not enough chargers even to charge the tiny amount of ZEV trucks on the road today. "Southern California Edison has come across some fleets powering chargers using diesel generators—the fuel regulators are trying to avoid—

so that new EV trucks don't sit unused." *See* Jennifer Hiller, *Electric Big Rigs Hit the Streets, but Chargers Are Scarce*, WSJ (July 16, 2023).

165.   CARB projects that 157,000 new chargers will need to be built by 2030 and 258,000 new chargers by 2037 to accommodate its mandated demand. To put that in perspective, only about 10,000 light-duty fast chargers have been built in California after a decade of sustained public and private investments. Cal. Energy Comm'n, *Electric Vehicle Chargers*, https://perma.cc/Y22P-G3PG(last updated Sept. 15, 2023).

166.   California is not China. Building a single charging station in California, including planning, designing, and permitting, may take up to 48 months, assuming the project is approved by local authorities. ACF would require roughly 14,000 chargers that don't exist by 2025. *Comments of the Truck & Engine Mfrs. Ass'n*, 255-45d, at 6–8 (Oct. 17, 2022), https://perma.cc/HAT7-DQSE. These chargers are not being built.

167.   Even without the red tape, these chargers cannot be built in many parts of California. The existing grid capacity cannot support them. As the California Energy Commission's EDGE model shows, in many parts of California, there is no excess grid capacity to support the additional load from heavy-duty vehicle charging—at least without thermal or voltage violations. *Comments of Am. Trucking Assn's & Cal. Trucking Assn.*, 282-45d (Oct. 17, 2022), https://perma.cc/2EKT-3T29.

168.   Local officials and utilities have already halted company plans for electrifying fleets over these reliability concerns. For example, when a "California company tried to electrify 12 forklifts," the "[l]ocal power utilities told them that's not possible." Am. Trucking Ass'n, *A heavy dose of reality for electric truck mandates* (Apr. 19, 2023).

169.   ***Uncertain Battery Life and Residual Values.*** A heavy-duty diesel tractor may operate for one million miles throughout its life while averaging approximately 50,000 miles per year, or up to 100,000 to 80,000 miles per year for

sleeper tractor cabs. It can operate for 12 to 16 years before needing an engine rebuild. The compression-ignition engine powered by diesel is synonymous with reliable and durable.

170.   No electric heavy-duty vehicles have been in service long enough to demonstrate similar track records of long-term reliability. ZEV trucks (and especially ZEV batteries) are not warranted by manufacturers for that long, if at all. Typically, ZEV manufacturers warrant batteries for only eight years, with significant allowances for battery degradation.

171.   Because ZEVs have no track record of long-term reliability, and because batteries degrade over time, depending on complex factors such as temperature and weather, use patterns, and charging patterns, their long-term reliability remains unknown, and their residual value is correspondingly far lower than a comparable internal-combustion vehicle.

172.   CARB ignores this, naively assuming that ZEVs "depreciate at the same rate as diesel powered vehicles." CARB, *Total Cost of Ownership Discussion Document* G-29, App'x G to Initial Statement of Reasons, https://perma.cc/BSR8-HVL2.

173.   CARB also promises that electric vehicles will require less maintenance, but experience in the light-duty market shows otherwise. *See* Consumer Reports, *Who Makes the Most Reliable New Cars* (Nov. 29, 2023), https://perma.cc/K8CW-4LNH (electric vehicles have 79% more problems than gas vehicles).

174.   Even if ZEVs require less minor maintenance, when maintenance is needed, it will be expensive. Rebuilding a Class 8 diesel engine typically costs between $20,000 and $40,000. Battery replacement will run well over $100,000.

175.   ***Risky.*** Electric vehicles cost more to insure. Premiums are higher not just because these vehicles have a higher upfront cost, but also because a highway accident easily survived by an internal-combustion engine may total an expensive battery.

///

176.   Battery-electric vehicles are also a threat to public safety. Spontaneous fires involving battery-electric vehicles have been reported across the country and led to several recalls. According to an investigation by the National Transportation Safety Board, battery-electric vehicle crashes place emergency responders at risk from "electric shock, thermal runaway, battery ignition and reignition, and stranded energy." *Safety Report: Safety Risks to Emergency Responders from Lithium-Ion Battery Fires in Electric Vehicles*, NTSB/SR-20/01 (Nov. 2020) (abstract), https://perma.cc/J6Q4-8WBP.

177.   Because electric vehicles are heavier than internal-combustion vehicles, their greater weight also increases kinetic energy and hence the impact of highway collisions, exacerbating injuries and property damage in the case of a vehicle accident.

**C.     Battery-Electric Vehicles Are Not All That "Clean"**

178.   CARB claims it wants to mandate ZEVs in order to reduce air pollutant emissions in California, including greenhouse gas emissions. CARB, Resolution 23-13, at 30–31, https://perma.cc/E5A3-EFNE. CARB claims that "ZEV technologies eliminate all tailpipe emissions of criteria pollutants and GHGs from vehicles and will consequently achieve the maximum degree of emission reductions possible from vehicular sources."

179.   Of course, ZEVs are not environmental Nirvana. They have significant tradeoffs. They are heavier, and so increase particle emissions from tire wear. They also shift carbon and other air pollutant emissions to the electricity sector, and to the industrial sectors of other countries. Children in the Congo, for example, breath toxic sulfur gases from unregulated copper and cobalt ore processing used to produce lithium-ion batteries. Siddharth Kara (@siddharthkara), X, https://perma.cc/X3CL-ZRUH.

180.   CARB claims that battery-electric vehicles will nevertheless reduce greenhouse gas emissions. But CARB acknowledges that the "lifecycle" emissions of ZEVs are subject to "significant uncertainties and variation." CARB, *Legal Comments*

*and Responses* 8, App'x A to Final Statement of Reasons, https://perma.cc/2DQE-BBVB.

181.    Most of the emissions from manufacturing ZEVs happen in the mining and mineral processing sectors of other countries, with little transparency. No one really knows how much carbon is emitted mining and processing for cobalt in the Congo, or for nickel in Indonesia. Indeed, the uncertainties in the supply chain for batteries are so significant, it's possible battery-electric vehicles may not reduce lifecycle greenhouse gas emissions much at all, particularly when electric vehicles are compared to hybrid powertrains, not the "average" gas or diesel vehicles CARB likes using as a comparison. *See generally* Mark Mills, *Electric Vehicles for Everyone? The Impossible Dream* 7–22 (July 2023), https://perma.cc/TBV6-MMC3. Lifecycle assessments of ZEV emissions vary by approximately 600%, depending on modeling choices and assumptions. *Id.*

182.    One thing is clear: producing an electric vehicle requires far more greenhouse gas emissions than producing a diesel vehicle. According to Argonne National Laboratory's GREET model, manufacturing a battery-electric sleeper cab results in 478,055 pounds of carbon dioxide, but making a similar diesel truck results in 74,728 pounds, about 84% less carbon dioxide. Am. Transp. Rsch. Inst., *Understanding the $CO_2$ Impacts*, *supra*, at 19.

183.    It takes a lot of miles driven to get "payback" on this initial carbon "debt." Ironically, CARB is also trying to reduce vehicle miles traveled, reducing the payback.

184.    Indeed, CARB's mandates may do nothing to reduce greenhouse gases. CARB's ZEV mandates are "nested" within the fleet-average national truck standards administered by EPA and NHTSA. In effect, CARB is mandating that manufacturers comply with national standards using a less cost-effective technology, at least in California. The nationwide reduction may well be zero, or small. For every electric vehicle sold in California, manufacturers may sell a less efficient internal-

1  combustion vehicle elsewhere in the United States and still comply with the same

2  national fleet-average standards. The predictable result: CARB's rules alter the

3  vehicle mix sold in California, but have little discernible effect on global carbon

4  emissions.

5      185.   This out-of-state "leakage" effect of ZEV standards has been modeled in

6  several studies. *See, e.g.*, A. Jenn et al., *Cost Implications for Automaker Compliance*

7  *of Zero Emissions Vehicle Requirements*, 53 Environ. Sci. Technol. 564, 568–69 (2019).

8  CARB ignores it.

9      186.   Ignoring leakage makes no sense. Carbon dioxide mixes in the upper

10  atmosphere, leaving the same concentration over California as over the rest of the

11  country and, indeed, the whole world. Consequently, as EPA and NHTSA have

12  explained, California's carbon emissions are "not more relevant to the pollution

13  problem at issue (i.e., climate change) . . . than are the [carbon-dioxide] emissions

14  from cars being driven in New York, London, Johannesburg, or Tokyo." 84 Fed. Reg.

15  51,310, 51,354 (Sept. 27, 2019).

16      187.   CARB also ignores the air pollution, toxic waste, and the ecological,

17  societal, and human health impacts of electric vehicle supply chains in other countries.

18  Digging, crushing, and transporting the minerals needed to make batteries is anything

19  but "clean." *See* Planet of the Humans, *How Solar Cells and Wind Turbines Are Made*

20  *(and Electric Vehicles Too)*, https://www.youtube.com/watch?v=EHSGsDipTOU.

21      188.   The required global emissions and environmental degradation doesn't

22  happen within California's borders, and so CARB's economic analysis ignores this.

23  **V.    California's "Enforcement Discretion"**

24      189.   Under the high-priority fleet rule, beginning in 2024, fleets may only

25  buy internal combustion vehicles that fully meet California's emission standards. Cal.

26  Code Regs. tit. 13, § 2015.6.

27      190.   But few new vehicles sold comply with California's standards. Especially

28  few comply with CARB's "Omnibus" rule, which hasn't received a waiver from EPA.

Most are being sold under a "legacy" exemption, but these vehicles don't fully comply with the Omnibus rule. As a result, fleet owners and operators have not been able to order new vehicles.

191. To prevent a collapse in out-of-state sales of medium-duty vehicles, the Truck & Engine Manufacturers Association had to request an advisory from CARB. The manufacturers requested that CARB exercise "enforcement discretion" for model years 2024 though 2026. Letter from Jed R. Mandel, President, Truck & Engine Mfrs. Ass'n, to Ellen Peter, Chief Counsel, CARB (June 28, 2023), https://perma.cc/UX7Z-R56J.

192. In response, CARB stated "that initiating enforcement actions [of this specific rule] against an out-of-state fleet, . . . for model years 2024 and 2025 *may* not be warranted based on the specific and fluctuating circumstances of engine sales," and that in the future, CARB "*may* . . . determine that similar discretion should be extended to model year 2026." Letter from Ellen Peter, Chief Counsel, CARB, to Jed R. Mandel, President, Truck & Engine Mfrs. Ass'n (July 6, 2023) (emphasis added), https://perma.cc/XH7M-K6M8.

193. Further, CARB has held "discussions" with the California Trucking Association. Letter from Steven S. Cliff, Executive Officer, CARB, to Chris Shimoda, Senior Vice President, Government Affairs, Cal. Trucking Ass'n (Dec. 27, 2023), https://perma.cc/ZL4H-RYZF.

194. As part of those discussions, CARB has conveyed that "CARB will not take enforcement action as to the high-priority or drayage fleet reporting requirements or registration prohibitions until U.S. EPA grants a preemption waiver applicable to those regulatory provisions or determines a waiver is not necessary." *Id.*

195. CARB, however, "reserves all of its rights to enforce the ACF regulation in full for any period for which a waiver is granted or for which a waiver is determined to be unnecessary," from "January 1, 2024" onwards. *Id.* at 2.

///

196.    CARB's "discretion" about what it "may" do is cold comfort to fleet businesses who face draconian (and Kafkaesque) penalties.

## DECLARATORY RELIEF ALLEGATION

197.    There is an actual controversy between Plaintiffs and Defendants with respect to the validity—under the Clean Air Act, the Energy Independence and Security Act of 2007, and the Federal Aviation Administration Authorization Act of 1994—of the CARB regulations challenged herein.

## FIRST CLAIM FOR RELIEF

## (Clean Air Act Preemption)

198.    Plaintiffs reallege paragraphs 1 through 1967 as if fully stated herein.

199.    The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

200.    The Supremacy Clause "creates a rule of decision": judges "must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). When a state law or regulation conflicts with a federal law, it is preempted and void.

201.    The Supremacy Clause does not permit a "presumption against preemption." The text of the Supremacy Clause "suggests that courts should not strain to find ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011) (plurality); *see also* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 290–303 (2000). In any event, where a federal "statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico*

*v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 594 (2011)); *see also Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1050 (9th Cir. 2023) (same).

202.   Section 209(a) of the Clean Air Act provides that "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a).

203.   **ZEV Purchase Mandate**: The high-priority fleet rule sets a standard for new motor vehicles. Under the default option, covered fleet owners may add only zero-emission vehicles to their California fleet. Cal. Code Regs. tit. 13, § 2015.1(a) ("Any vehicle added to the California fleet must be a ZEV."). Or, in the alternative, fleets may comply using the "ZEV Milestones" option by ramping up the percentage of ZEV vehicles in their California fleet. *Id.* § 2016(b).

204.   CARB's legal response suggests that it believes these are not "standards" covered by the Act. CARB, Legal Comments and Responses 27, 30.

205.   That is wrong. "Today, as in 1967 when § 209(a) became law, 'standard' is defined as that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004) (quoting *Webster's New International Dictionary* 2455 (2d ed.1945)). The rule sets a "criterion": vehicles must have zero exhaust emissions of greenhouse gas and criteria pollutants under any mode of operation.

206.   This criterion is self-evidently one "relating to the control of emissions from new motor vehicles." On its face, the rule sets "numerical emission levels with which vehicles or engines must comply" (zero emissions), and therefore falls within the core of the Clean Air Act's prohibition on state standards. *Engine Mfrs. Ass'n*, 541 U.S. at 253.

207.   Indeed, two courts of appeals have already concluded that ZEV percentage standards are preempted by § 209(a). *Am. Auto. Mfrs. Ass'n v. Cahill,* 152

F.3d 196, 200 (2d Cir.1998); *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 6–7 (1st Cir. 2000).

208.   It matters not that the rule restricts fleet purchases rather than sales: "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense. The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Engine Mfrs. Ass'n*, 541 U.S. at 255.

209.   California's high-priority fleet rule applies to all heavy-duty vehicles added to a regulated California fleet, including "new motor vehicles." Therefore, it is preempted.

210.   CARB claims that the high-priority fleet rule does not need a waiver because fleets could comply using only "post-sale vehicles."

211.   But as CARB concedes, that is not practicable: the high-priority fleet rule alone will require some 350,000 electric vehicles. According to the California Energy Commission, leaving aside buses, the total on-road fleet of heavy-duty ZEVs in California consists of 272 trucks and 340 delivery vans.

212.   A primary objective of the high-priority fleet rule, indeed, is to compel demand for new heavy-duty ZEVs above and beyond what Advanced Clean Trucks already requires.

213.   Because § 209(a) refers to standards "*relating to* the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a) (emphasis added), its preemptive effect therefore extends beyond explicit regulation of conduct that precedes a vehicle's initial sale. EPA and the courts have long recognized that § 209(a) prevents a State from "impos[ing] its own emission control standards the moment after a new car is bought and registered." *Allway Taxi, Inc. v. City of New York*, 340 F. Supp. 1120, 1124 (S.D.N.Y.), *aff'd*, 468 F.2d 624 (2d Cir. 1972); *see also* 59 Fed. Reg. 31,306, 31,330 (June 17, 1994) ("EPA expects that the principles articulated in *All-way Taxi* will be applied by the courts to any State adoption of in-use controls."); *Engine*

*Manufacturers Ass'n v. EPA*, 88 F.3d 1075, 1086 & n. 39 (D.C. Cir. 1996) (endorsing *Allway Taxi*). *Allway Taxi* reflects the "just and well-settled doctrine . . . that a State cannot do that indirectly which she is forbidden . . . to do directly." *Passenger Cases*, 48 U.S. 283, 458 (1849); *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 8 (2009) (same).

214.    Imposing a different standard for used vehicles would be an obvious evasion of § 209(a), as it would have a manifest practical tendency to alter manufacturers' choices regarding the sales of new vehicles. The effects are even more obvious in this case because there are practically no used heavy-duty ZEVs in the used vehicle market. For the rule to work, a vast number of new ZEVs must be sold by manufacturers.

215.    The high-priority fleet rule, therefore, conflicts with § 209(a) and is preempted.

216.    The high-priority fleet rule has not received a waiver under § 209(b).

217.    A waiver from EPA, moreover, would have no operative effect on the validity of the rule. The rule was adopted as state law without a waiver, so it is void *ab initio*. Given the lead time afforded by CARB, any other interpretation would effectively force manufacturers to comply with a rule that has not received a waiver from EPA and that may not even be adopted, let alone enforced, circumventing the statutory design. Further, even if a waiver is granted, CARB may not retroactively enforce the rules to punish violations that occurred before the waiver was granted.

218.    **<u>Certification Requirement</u>**: Under the high-priority fleet rule, fleet owners and operators must only purchase internal-combustion vehicles that comply with California's emissions standards, even if the vehicles are registered and operated outside the state. Cal. Code Regs. tit. 13, § 2015(r) ("Any new ICE vehicle added to the California fleet must be certified to applicable California emissions standards and emissions related requirements.").

///

219.   This extends a new standard to out-of-state vehicles not covered by any prior California waiver, and is therefore preempted.  It is also an "attempt to enforce" standards relating to the control of emissions, and to require certification with preempted standards. For example, these requirements force interstate fleets to purchase new vehicles that are certified in California to meet CARB's "Omnibus" rule for heavy-duty vehicles, even though that rule hasn't received a waiver from EPA. Requiring new vehicles to certify to this standard is attempting to enforce it. CARB's attempt to enforce compliance with the Omnibus rule for heavy-duty vehicles, even for vehicles outside of California, conflicts with § 209(a) and is preempted.

220.   A waiver from EPA, moreover, would have no operative effect on the validity of the rule. The rule was adopted as state law without a waiver, and so it is void *ab initio*.

221.   **<u>Drayage Truck Rule</u>**: The drayage truck rule sets a standard for new drayage vehicles. Under the rule, as of January 1, 2024, owners and operators of drayage services may add only zero-emission vehicles to their California fleets. Cal. Code Regs. tit. 13, § 2014.1(a)(1)(A) ("Beginning January 1, 2024, all drayage trucks registering in the CARB Online System must be zero-emission vehicles."). By January 1, 2035, California drayage fleets may include only zero-emission vehicles. *Id.* § 2014.1(a)(2)(A) ("Beginning January 1, 2035, all drayage trucks in the CARB Online System must be zero-emission vehicles and only zero-emission drayage trucks can provide drayage service in California.").

222.   CARB's request for a waiver suggests that it believes the drayage rule is an "in-use" or "post-sale" regulation that is not preempted by the Clean Air Act. ACF Waiver Request, *supra*, at 19–20.

223.   That is wrong. CARB acknowledges that "under current industry conditions, it is unlikely that there will be sufficient numbers of either used [zero-emission vehicles] or [near-zero emission vehicles] or engine or vehicle conversion kits to enable drayage . . . fleets to comply with applicable fleet requirements solely by

1  utilizing post-new vehicle sales." *Id.* at 20. In practice, the drayage rule requires

2  drayage fleet owners and operators to purchase new zero-emission vehicles.

3      224.   Like the high-priority fleet rule's ZEV purchase mandate, the drayage

4  rule is a "standard relating to the control of emissions from new motor vehicles or

5  new motor vehicle engines" preempted by § 209(a). 42 U.S.C. § 7543(a).

6      225.   The drayage truck rule has not received a waiver under § 209(b).

7      226.   A waiver from EPA, moreover, would have no operative effect on the

8  validity of the drayage rule. The rule was adopted as state law without a waiver, and

9  so is void *ab initio.* Any other interpretation would effectively force manufacturers to

10  comply with a rule that has not received a waiver from EPA and that may not even

11  be adopted, let alone enforced, circumventing the statutory design. Further, even if a

12  waiver is granted, CARB may not retroactively enforce the drayage rule to punish

13  violations that occurred before the waiver was granted.

**SECOND CLAIM FOR RELIEF**

**(EISA Preemption)**

16      227.   Plaintiffs reallege paragraphs 1 through 196 as if fully stated herein.

17      228.   The high-priority fleet and drayage truck rules conflict with EISA, 49

18  U.S.C. § 32902(k).

19      229.   The high-priority fleet and drayage truck rules apply to commercial

20  medium and heavy-duty vehicles as those terms are defined by EISA.

21      230.   For these vehicles, EISA vests NHTSA, through its delegation from the

22  Secretary of Transportation, 49 C.F.R. §§ 1.94(c), 1.95(j)(3), with authority to set

23  "maximum feasible" fuel consumption standards that are "appropriate, cost-effective,

24  and technologically feasible." 49 U.S.C. § 32902(k)(2).

25      231.   "The term 'maximum' ordinarily means the upper limit of a range, the

26  greatest quantity possible or permissible." *United States v. Fountain*, 83 F.3d 946,

27  952 (8th Cir. 1996). NHTSA is therefore tasked with achieving a prescriptive, golden

28  mean—to reduce fuel consumption as far as technologically possible, within the

bounds of what is cost-effective and generally reasonable for manufacturers and the public. *See, e.g., Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 359 (2000) (Breyer, J., concurring) (noting the difference between federal optimum and minimum standards). Congress "'made a considered judgment' or 'a deliberate choice to preclude state regulation when a federal enactment clearly struck a particular balance of interests that would be disturbed or impeded by state regulation." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quoting *Arizona v. United States*, 567 U.S. 387, 405 (2012)). "Where Congress has determined the appropriate balance, state regulation involving a different method of enforcement may upset that balance and be displaced by federal law even where the state 'attempts to achieve one of the same goals as federal law.'" *Id.* at 1213 (quoting *Arizona*, 567 U.S. at 405).

232.   CARB notes that it is mandating battery-electric vehicles in part because they are more "efficient" compared to internal-combustion vehicles. CARB, Resolution 23-13, at 11, https://perma.cc/E5A3-EFNE. It claims that "ZEVs reduce dependence on petroleum," the statutory objective of EISA. *Id.*

233.   CARB also claims that ZEVs will reduce carbon dioxide tailpipe emissions from vehicle combustion. That is simply another way of saying it will reduce vehicle fuel consumption. *See Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015).

234.   Carbon dioxide is an inevitable byproduct of combusting a mixture of carbon-based fuel, including hydrocarbons or biofuels, and air.

235.   The fuel consumption of internal-combustion vehicles powered by hydrocarbons or biofuels may therefore be determined by measuring the carbon-related exhaust emissions of the vehicle, which are dominated by carbon dioxide. Under NTSA's regulations, manufacturers measure fuel consumption "for vehicles fueled by conventional and alternative fuels" by using "$CO_2$ emissions test results." 49 C.F.R. § 535.6(a)(3).

236.   Mandating that heavy-duty vehicles have zero carbon dioxide emissions per mile, therefore, is the equivalent of a standard of zero fuel consumed per mile for these vehicles.

237.   Nitrogen dioxide is a byproduct of burning a fuel-air mixture in internal-combustion engines.

238.   Mandating that heavy-duty vehicles have zero nitrogen dioxide emissions, therefore, is equivalent to mandating a standard of zero fuel consumed per mile for internal-combustion engines.

239.   In any event, to qualify as a ZEV under the high-priority fleet rule, the vehicle must have a "zero emissions powertrain," Cal. Code Regs. tit. 13, § 2015(b), which CARB defines to include only "an all-electric or hydrogen fuel-cell powertrain assembly." *Id.* §1956.8(j)(27).

240.   CARB believes ZEVs are a cost-effective means of reducing fuel consumption.

241.   CARB, in other words, disagrees with Congress's and NHTSA's policy judgment on the "maximum feasible" fuel consumption standard. In CARB's judgment, those fuel consumption standards are not good enough, and a fuel consumption standard of zero gallons per mile is the only appropriate standard for these vehicles. *See* 49 C.F.R. § 535.6(a)(3)(iii) (battery-electric vehicles are assigned "a value of zero gallons per 100 miles").

242.   "The Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress." *Mensing*, 564 U.S. at 621. By vesting NHTSA with exclusive authority to set a prescriptive "maximum," but "cost-effective," standard for fuel consumption, Congress has impliedly repealed conflicting state laws attempting to go above the federal ceiling. CARB's rules, requiring manufacturers to go further in improving fuel consumption than the federal "maximum," logically conflict with the text of EISA and are thus preempted. California has simply decreed a different *de facto* maximum fuel consumption

standard: zero.

243.   The rules are also preempted because they "create[] an obstacle to the full purposes and objectives of Congress" in EISA. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000). NHTSA has determined that a cost-effective standard should be a performance standard that encourages manufacturers to reduce fuel consumption using a "variety and mix of devices." *Id.* By mandating a single ZEV compliance pathway that NHTSA has determined is not the most "cost-effective" way of improving fuel consumption in all covered trucks and vans, CARB creates an obstacle to cost-effective national regulation, and to achieving the full purposes and objectives of Congress as evidenced by the text: a "maximum" and "cost-effective" rule. *See In re Volkswagen*, 959 F.3d at 1213.

### THIRD CLAIM FOR RELIEF

### (F4A Preemption)

244.   Plaintiffs reallege paragraphs 1 through 196 as if fully stated herein.

245.   The F4A provides that a State "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property," subject to several limited statutory exceptions. 49 U.S.C. § 14501(c)(1).

246.   A state law is "related to a price, route, or service" of a motor carrier if it "ha[s] a connection with, or reference to carrier rates, routes, or services," even if the effect on rates, routes, or services is "only indirect." *Rowe*, 552 U.S. at 370 (cleaned up); *accord Dilts v. Penske Logistics*, LLC, 769 F.3d 637, 645 (9th Cir. 2014).

247.   The high-priority and drayage truck rules relate to and are intimately connected with carrier rates, routes, and services, and so they are preempted under the F4A. The rules compel motor carriers to modify their operations in ways that will significantly affect their services, routes, and rates.

///

248.   The rule compels California fleets to raise rates because it requires more expensive vehicles, and capital investments in equipment and infrastructure that will substantially increase costs, resulting in higher cost of freight and drayage services for consumers.

249.   ZEVs will reduce payload, resulting in higher costs of freight and drayage services for consumers.

250.   The rules affect rates because ZEVs have a substantially lower range and payload capacity, which will require freight and drayage trucks to take more trips, shorter trips, refuel more often, and take different trips using highways that have the necessary charging infrastructure.

251.   That violates "Congress' overarching goal": to "assure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality," and to avoid "a patchwork of state service-determining laws, rules, and regulations." *Rowe*, 552 U.S. at 371, 373 (cleaned up). By forcing fleets to buy the same powertrains, the rules dictate a single solution and prevent competition between motor carriers, stifling innovation and balkanizing commercial transport.

252.   The rules do not fall within any exception to F4A preemption. *See* 49 U.S.C. § 14501(c)(2)–(3).

## PRAYER FOR RELIEF

253.   WHEREFORE, Plaintiffs pray that the Court enter judgment against Defendants and award the following relief:

(a)   a declaration, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that Articles 3.3 and 3.4 of Chapter 1, Division 3, Title 13, California Code of Regulations, violate federal law in the manner alleged above;

(b)   a permanent injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants or their agents from enforcing Articles 3.3 and 3.4 of Chapter 1, Division 3, Title 13, California Code of Regulations;

(c)     attorney fees pursuant to 42 U.S.C. § 1988;

(d)     costs of suit; and

(e)     such other relief as the Court deems just and proper.

Dated:  April 1, 2024                    Respectfully submitted,

*/s/ Eric Grant*

Michael Buschbacher
James R. Conde
Laura B. Ruppalt
Boyden Gray PLLC

Eric Grant
Hicks Thomas LLP

Counsel for Plaintiffs