1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MYUNG J. PARK, State Bar No. 210866
    Supervising Deputy Attorney General
3   BENJAMIN P. LEMPERT, State Bar No. 344239
    DAVID M. MEEKER, State Bar No. 273814
4   JONATHAN A. WIENER, State Bar No. 265006
    M. ELAINE MECKENSTOCK, State Bar No. 268861
5   Deputy Attorney General
      1515 Clay Street, 20th Floor
6     Oakland, CA  94612-0550
      Telephone:  (510) 879-0299
7     Fax:  (510) 622-2270
      E-mail:  Elaine.Meckenstock@doj.ca.gov
8   *Attorneys for Defendants Steven S. Cliff and Rob
    Bonta, in their official capacities*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

SACRAMENTO DIVISION

12

13

| | |
|---|---|
| 14  **AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE; and ASSOCIATED EQUIPMENT DISTRIBUTORS,** | 2:24-cv-00988-TLN-CKD |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| v. | Date:          Sept. 5, 2024<br>Time:          2:00 pm<br>Courtroom:  2, 15th Floor<br>Judge:         Hon. Troy N. Nunley<br>Trial Date:   Not Set<br>Action Filed:  April 1, 2024 |
| **STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board; and ROB BONTA, in his official capacity as the Attorney General of the State of California,** | |
| Defendants. | |

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    A.    Motor Vehicle Emissions Threaten Public Health and Welfare .......................... 2

    B.    Regulation of Motor Vehicle Emissions under the CAA ...................................... 2

    C.    The ACF Regulation ............................................................................................ 3

    D.    ACF Builds on Industry Trends and Other Policies and Programs ....................... 4

    E.    Procedural History .............................................................................................. 6

LEGAL STANDARD .......................................................................................... 6

ARGUMENT ........................................................................................................ 7

I.    Plaintiffs' Complaint Should Be Dismissed for Lack of Standing ..................... 7

II.    Plaintiffs Cannot State a CAA Preemption Claim over which this Court Has
Jurisdiction ........................................................................................................ 8

III.    Plaintiffs Cannot State a Claim for EISA Preemption ..................................... 12

IV.    Plaintiffs Cannot State a Claim for F4A Preemption ....................................... 14

    A.    The F4A Leaves Unchanged California's Ability to Regulate Motor
Vehicle Emissions ............................................................................................ 15

    B.    Even Assuming Plaintiffs Are Not Categorically Barred from Claiming the
F4A Preempts California Emissions Standards, Plaintiffs' Claim Still Fails ....... 16

        1.    Plaintiffs' allegations do not support a facial preemption claim .............. 17

        2.    Plaintiffs allege only indirect effects that are too peripheral to
trigger preemption ......................................................................... 17

V.    The Attorney General Should Be Dismissed from All Claims Except Those against
the Drayage Requirements ................................................................................ 19

CONCLUSION ................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

CASES

*AGG Enters. v. Washington Cnty.*
   281 F.3d 1324 (9th Cir. 2002)...................................................................... 16

*Bedoya v. Am. Eagle Express Inc.*
   914 F.3d 812 (3d Cir. 2019)........................................................................ 18

*BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*
   904 F.3d 755 (9th Cir. 2018)................................................................. 15, 16

*Bova v. City of Medford*
   564 F.3d 1093 (9th Cir. 2009)............................................................... 10, 11

*Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A.*
   519 U.S. 316 (1997)................................................................................... 16

*California Dump Truck Owners Ass'n v. Nichols*
   2012 WL 273162 (E.D. Cal. Jan. 30, 2012)............................................... 18

*California Trucking Ass'n v. Bonta*
   996 F.3d 644 (9th Cir. 2021)................................................................. 17, 18

*California Trucking Ass'n v. S. Coast Air Quality Mgmt. Dist.*
   2023 WL 9622548 (C.D. Cal. Dec. 14, 2023) ........................................... 18

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*
   152 F.3d 1184 (9th Cir. 1998)................................................................... 18

*CDK Glob. LLC v. Brnovich*
   16 F.4th 1266 (9th Cir. 2021).................................................................... 17

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
   563 F. Supp. 2d 1158 (E.D. Cal. 2008)...................................................... 11

*Cent. Valley Chrysler-Jeep v. Goldstene*
   529 F. Supp. 2d 1151 (E.D. Cal. 2007)...................................................... 13

*Chamber of Com. Of U.S. v. Whiting*
   563 U.S. 582 (2011).................................................................................. 14

*Chandler v. State Farm Mut. Auto. Ins. Co.*
   598 F.3d 1115 (9th Cir. 2010)..................................................................... 6

*Chicanos Por La Causa, Inc. v. Napolitano*
   558 F.3d 856 (9th Cir. 2009)..................................................................... 14

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*CTA v. S. Coast Air Qual. Mgmt. Dist.*
  2023 WL 9622548 (C.D. Cal. Dec. 14, 2023) ............................................................... 16, 18

*Dan's City Used Cars Inc. v. Pelkey*
  569 U.S. 251 (2013) ....................................................................................................... 17

*Dilts v. Penske Logistics, LLC*
  769 F.3d 637 (9th Cir. 2014) ......................................................................................... 19

*English v. Gen. Elec. Co.*
  496 U.S. 72 (1990) ......................................................................................................... 13

*Epic Sys. Corp. v. Lewis*
  584 U.S. 497 (2018) .................................................................................................. 13, 15

*Ex Parte Young*
  209 U.S. 123 (1908) ....................................................................................................... 19

*FDA v. All. for Hippocratic Med.*
  602 U.S. --, 2024 WL 2964140 (June 13, 2024) ............................................................ 7, 8

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*
  508 F. Supp. 2d 295 (D. Vt. 2007) ................................................................................ 13

*In re Finjan Holdings, Inc.*
  58 F.4th 1048 (9th Cir. 2023) ......................................................................................... 4

*In re Gilead Sci. Sec. Litig.*
  536 F.3d. 1049 (9th Cir. 2008) ........................................................................................ 6

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*
  959 F.3d 1201 (9th Cir. 2020) ....................................................................................... 12

*Ishikawa v. Delta Airlines, Inc.*
  343 F.3d 1129 (9th Cir. 2003) ....................................................................................... 13

*Jackson v. Carey*
  353 F.3d 750 (9th Cir. 2003) ........................................................................................... 7

*Khoja v. Orexigen Therapeutics, Inc.*
  899 F.3d 988 (9th Cir. 2018) ........................................................................................... 4

*L.A. County Bar Ass'n v. Eu*
  979 F.2d 697 (9th Cir. 1992) ......................................................................................... 20

## TABLE OF AUTHORITIES
### (continued)

Page

*Lujan v. Defs. of Wildlife*
   504 U.S. 555 (1992) ................................................................ 7, 8

*Lyon v. Gila River Indian Cmty.*
   626 F.3d 1059 (9th Cir. 2010) ............................................... 9

*Massachusetts v. EPA*
   549 U.S. 497 (2007) ................................................................ 13

*Missouri ex rel. Koster v. Harris*
   847 F.3d 646 (9th Cir. 2017) ............................................... 8

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*
   627 F.2d 1095 (D.C. Cir. 1979) ........................................ 2, 9, 10

*Motor & Equip. Mfrs. Ass'n v. Nichols*
   142 F.3d 449 (D.C. Cir. 1998) ........................................... 10

*NLRB v. Bell Aerospace Co. Div. of Textron*
   416 U.S. 267 (1974) ............................................................... 10

*Ohio v. EPA*
   98 F.4th 288 (D.C. Cir. 2024) ............................................ 15

*Pennhurst State Sch. & Hosp. v. Halderman*
   465 U.S. 89 (1984) ................................................................. 10

*Pleasant Hill Bayshore Disposal v. Chip-It Recycling*
   91 Cal. App. 4th 678 (Cal. Ct. App. 2001) ....................... 16

*Safe Air for Everyone v. Meyer*
   373 F.3d 1035 (9th Cir. 2004) ............................................. 6

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*
   697 F.3d 544 (7th Cir. 2012) .............................................. 18

*Summers v. Earth Island Inst.*
   555 U.S. 488 (2009) ............................................................... 7

*Taggart v. Lorenzen*
   587 U.S. 554 (2019) ............................................................... 10

*TransUnion LLC v. Ramirez*
   594 U.S. 413 (2021) ............................................................... 7

iv

### TABLE OF AUTHORITIES
**(continued)**

**Page**

*Wilson v. Craver*
    994 F.3d 1085 (9th Cir. 2021) .................................................................................. 7

*Woods v. U.S. Bank N.A.*
    831 F.3d 1159 (9th Cir. 2016) .................................................................................. 6


**STATUTES**

26 U.S.C. § 45W ............................................................................................................... 5

42 U.S.C. § 7432 ............................................................................................................... 5

42 U.S.C. § 7507 ......................................................................................................... 3, 16

42 U.S.C. § 7521(a)(1) ..................................................................................................... 2

42 U.S.C. § 7543(a) ................................................................................................ 2, 8, 10

42 U.S.C. § 7543(b)(1) ......................................................................................... 2, 3, 8, 9

42 U.S.C. § 7543(b)(1)(C) ............................................................................................. 10

42 U.S.C. § 7543(e) ....................................................................................................... 10

42 U.S.C. § 7607(b) ................................................................................................ 3, 8, 11

49 U.S.C. § 14051(c)(1) ................................................................................................. 14

49 U.S.C. § 14501(c)(2)(B) ........................................................................................... 17

49 U.S.C. § 32901(a) ..................................................................................................... 13

49 U.S.C. § 32902(k) ..................................................................................................... 12

Pub.L. No. 95-95, § 207, 91 Stat. 685 (1977) ............................................................... 10

Pub. L. 110–140, 121 Stat. 1492 (Dec. 19, 2007) .................................................. 12, 13

Pub. L. 117–169, tit. VI, Subtitle A, § 60105(g), 136 Stat. 1818, 2068-69 (2022) ............... 12, 16

Cal. Health & Saf. Code § 38501(a) ................................................................................ 2

Cal. Health & Saf. Code § 38550 .................................................................................... 2

Cal. Health & Saf. Code § 38562.2(c) ............................................................................ 2

**TABLE OF AUTHORITIES**
(continued)

**Page**

Cal. Health & Saf. Code § 38566 ...................................................................... 2

Cal. Health & Saf. Code § 43000 ...................................................................... 2

Cal. Penal Code § 830.1(b) ............................................................................. 20


**REGULATIONS**

40 C.F.R. § 1074.101(a)(1) ........................................................................... 10

49 C.F.R. § 535.3(d)(7) ................................................................................. 14

Cal. Code Regs., tit. 13, § 1963.1(b) ............................................................... 5

Cal. Code Regs., tit. 13, § 2014(b) ................................................................. 3

Cal. Code Regs., tit. 13, § 2014.1(a)(1)(A) ...................................................... 3

Cal. Code Regs., tit. 13, § 2014.1(a)(1)(C) ...................................................... 3

Cal. Code Regs., tit. 13, § 2014.1(a)(2) .......................................................... 3

Cal. Code Regs., tit. 13, § 2014.2(a) ............................................................... 4

Cal. Code Regs., tit. 13, § 2014.2(b) ............................................................... 4

Cal. Code Regs., tis. 13, § 2015(a)(1)(A)–(C) .................................................. 3

Cal. Code Regs., tit. 13, § 2014.3 .................................................................. 20

Cal. Code Regs., tit. 13, § 2015(b) ............................................................ 3, 17

Cal. Code Regs., tit. 13, § 2015(e) ................................................................. 3

Cal. Code Regs., tit. 13, § 2015(r) ................................................................ 11

Cal. Code Regs., tit. 13, § 2015.1(a) ............................................................... 3

Cal. Code Regs., tis. 13, § 2015.1(b) ............................................................... 3

Cal. Code Regs., tit. 13, § 2015.2 .................................................................. 3

Cal. Code Regs., tit. 13, § 2015.2(a) ................................................... 4, 18, 19

Cal. Code Regs., tit. 13, § 2015.3(c) ............................................................... 4

## TABLE OF AUTHORITIES
### (continued)

Page

Ca1. Code Regs., tit. 13, § 2015.3(d) ............................................................. 4

Cal. Code Regs., tit. 13, § 2015.3(e) ............................................................. 4

Cal. Code Regs., tit. 13, § 2015.6 ............................................................. 20

Cal. Code Regs., tit. 13, § 2016(c) ............................................................. 4


**FEDERAL REGISTER**

36 Fed. Reg. 8,172 (Apr. 30, 1971) ............................................................. 15

59 Fed. Reg. 36,969 (July 20, 1994) ............................................................. 9, 10

81 Fed. Reg. 73,478 (Oct. 25, 2016) ............................................................. 14

88 Fed. Reg. 20,688 (Apr. 6, 2023) ............................................................. 5

89 Fed. Reg. 29,440 (Apr. 22, 2024) ............................................................. 6, 19


**OTHER AUTHORITIES**

Greg Dotson, State Authority to Regulate Mobile Source Greenhouse Gas
    Emissions, Part 2: A Legislative and Statutory History Assessment,
    32 GEO. ENV'T L. REV. 625, 631–42 (2020) ............................................................. 13

**INTRODUCTION**

California began regulating motor vehicle emissions before the federal government or any other State did so.  When the federal government entered this field, Congress expressly preserved California's authority to continue and expand its regulation of new motor vehicle emissions.  California's program has been operating under that provision of the Clean Air Act (CAA) for more than half a century.  The California Air Resources Board (CARB) recently added the Advanced Clean Fleets (ACF) regulation to its program.  ACF is designed to gradually phase-in zero-emission vehicles (ZEVs) into certain fleets operating in California.  Plaintiffs—American Free Enterprise Chamber of Commerce and Associated Equipment Distributors—challenge two components of ACF: the requirements applicable to drayage fleets (which serve California's ports and railyards) and the requirements applicable to certain "high-priority fleets."  Plaintiffs allege these requirements are preempted under the CAA, the Energy Independence and Security Act of 2007 (EISA), and the Federal Aviation Administration Authorization Act (F4A).

But Plaintiffs' Complaint does not meet their burden to establish standing.  Plaintiffs rely on injuries to their members but have failed to identify a single member who is or will be injured.  Plaintiffs also fail to identify how any member is injured by the drayage fleet requirements.

Turning to Plaintiffs' claims, the CAA preemption claim should be dismissed because it presents no case or controversy this Court can resolve.  Rather, Plaintiffs seek an end-run around the preemption waiver and judicial review processes established by Congress.  This Court should decline Plaintiffs' invitation to interfere with Congress's clear direction.

Congress's express authorization—and repeated reaffirmation—of California's vehicle emissions program in the CAA is likewise fatal to Plaintiffs' EISA and F4A claims.  Additionally, Plaintiffs' implied preemption claim under EISA cannot be sustained in the face of Congress's explicit choice to allow only express preemption claims.  Plaintiffs' EISA and F4A claims also fail because they have failed to allege sufficient facts to support either claim.

Finally, if any challenges to the requirements for high-priority fleets survive, the California Attorney General should be dismissed from those challenges on sovereign immunity grounds.

1

**BACKGROUND**

**A.    Motor Vehicle Emissions Threaten Public Health and Welfare**

California's Legislature has determined that "[t]he emission of air pollutants from motor vehicles is the primary cause of air pollution in many parts of the state."  Cal. Health & Safety Code § 43000(a).  Reducing these emissions is thus of "prime importance for the protection and preservation of the public health and well-being."  *Id.* § 43000(b).  Although California has made substantial progress reducing emissions of, *inter alia*, fine particulate matter (sometimes called $PM_{2.5}$) and smog precursors (such as oxides of nitrogen (NOx)), more reductions are needed, including in the many parts of the State that have not attained federal air quality standards.  Defendants' Req. for Judicial Notice (RJN), Exh. A at 00125.  Many disadvantaged communities also continue to experience high levels of pollution and acute health risks.  *Id.* at 00124.

Motor vehicles are also significant sources of the greenhouse gases that are causing climate change.  RJN Exh. A at 00012.  The Legislature has declared that "[g]lobal warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California," with impacts including "the exacerbation of air quality problems, a reduction in the quality and supply of water …, a rise in sea levels resulting in the displacement of thousands of coastal businesses and residences, [and] damage to marine ecosystems and the natural environment."  Cal. Health & Safety Code § 38501(a).  CARB must adopt regulations to reduce the State's contributions to greenhouse gas emissions, *e.g.*, *id.* § 38550, to at least 40 percent below 1990 levels by the end of 2030, *id.* § 38566.  It is also state policy to reduce *net* greenhouse gas emissions to *zero* by 2045.  *Id.* § 38562.2(c)(1), (c)(2).

**B.    Regulation of Motor Vehicle Emissions under the CAA**

The CAA requires EPA to promulgate emission standards to control harmful pollution from new motor vehicles.  42 U.S.C. § 7521(a)(1).  Section 209(a) then preempts States from adopting such standards, *id.* § 7543(a), but Section 209(b)(1) requires EPA to waive that preemption for California, unless the evidence supports one of three bases for declining to do so, *id.* § 7543(b)(1).  *See also Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1109–10 (D.C. Cir. 1979) (describing history of waiver provision).  Other States may choose to

2

1    adopt California's standards as their own, subject to certain conditions.  42 U.S.C. § 7507.  To

2    request a Section 209(b)(1) waiver, California must determine that the State's new motor vehicle

3    "standards will be, in the aggregate, at least as protective of public health and welfare as

4    applicable Federal standards."  *Id.* § 7543(b)(1).  EPA must then consider California's request in

5    a public proceeding.  *Id.*  EPA's final waiver action is reviewable only in the appropriate Court of

6    Appeals.  *Id.* § 7607(b)(1).

7         **C.**    **The ACF Regulation**

8         ACF is an important addition to California's longstanding motor vehicle emissions

9    program.  It is comprised of three sets of fleet requirements, applicable to 1) state and local

10   government fleets, (2) drayage trucks,[1] and (3) high-priority[2] and federal fleets; and a fourth

11   component: a sales requirement applicable to manufacturers beginning in model year 2036.

12        All three categories of regulated fleets are required to phase-in ZEVs, but the specific

13   timelines and mechanisms vary.  For example, under the Drayage Requirements, any new vehicle

14   providing drayage services in California must be a ZEV.  Cal. Code Regs., tit. 13,

15   § 2014.1(a)(1)(A).  Beginning January 1, 2025, these fleets are also prohibited from using any

16   non-ZEV for drayage services in California if the truck is past its "minimum useful life"

17   threshold, *id.* § 2014.1(a)(1)(C), which generally means the truck is 18 years old or has traveled

18   800,000 miles, *id.* § 2014(b).  Beginning January 1, 2035, all drayage trucks operating in

19   California must be ZEVs.  *Id.* § 2014.1(a)(2).  The High-Priority Requirements include a similar

20   "Model Year Schedule" compliance option.  Cal. Code Regs., tit. 13, § 2015.1(a), (b).[3]  However,

21   these fleets may choose the "ZEV Milestones" path instead.  Under that option, the fleet must

22   reach set percentages of ZEVs for particular categories of vehicles by specified times.  *Id.*

23   § 2015.2.  For example, box trucks and similar vehicles must be 10 percent ZEVs by 2025, 25

24

25        [1] Drayage trucks are heavy-duty trucks that transport cargo to and from California's
     seaports and intermodal railyards.  Cal. Code Regs., tit. 13, § 2014(b).

26        [2] The high-priority fleet requirements apply to large fleets—*e.g.*, those with at least 50
     trucks or at least $50 million in annual revenue.  Cal. Code Regs., tit. 13, § 2015(a)(1)(A)–(C).

27        [3] In some instances, high-priority fleets may use near-zero-emission vehicles (NZEVs)
     which are "capable of operating like a ZEV … for a minimum number of miles."  Cal. Code

28   Regs., tit. 13, § 2015(b), (e).  For simplicity, this brief refers only to ZEVs.

1   percent by 2028, and so on, while sleeper cab tractors and similar vehicles must be 10 percent

2   ZEVs by 2030, 25 percent by 2033, and so on.  *Id.* § 2015.2(a).

3       CARB included drayage fleets in ACF because the communities located near drayage sites

4   (*e.g.*, ports and railyards) suffer disproportionately from harmful air pollution, RJN Exh. A at

5   00014, 00024, and because drayage trucks "generally travel a limited number of miles daily and

6   then return to a home base" where they can charge or otherwise refuel, facilitating the use of

7   ZEVs, *id.* at 00084, 00089.  CARB similarly concluded that "accelerated [zero-emission]

8   transitions are feasible" for high-priority fleets and that such transitions are "critical" to the

9   State's air pollution reduction and public health protection goals.  RJN Exh. A at 00013.

10      ACF includes extensions or exemptions to cover circumstances that may make timely

11  compliance unduly difficult.  For example, high-priority fleets can request an exemption to add a

12  new non-ZEV vehicle in the event that a vehicle with the requisite functionality "is not available

13  to purchase as a ZEV."  Cal. Code Regs., tit. 13, § 2015.3(e).  Similarly, if delivery of a timely-

14  ordered ZEV is delayed "due to circumstances beyond the fleet owner's control," that owner may

15  continue using an existing non-ZEV beyond the otherwise permissible period.  *Id.* § 2015.3(d);

16  *see also id.* § 2014.2(a).  *See also id.* §§ 2014.2(b), 2015.3(c).

17      The fourth component of ACF—the 2036 Sales Requirement—prohibits vehicle

18  manufacturers from selling new, heavy-duty non-ZEVs in California beginning with the 2036

19  model year.  Cal. Code Regs., tit. 13, § 2016(c).  Manufacturers have agreed to comply with this

20  requirement, regardless of the legal status of ACF.  RJN Exh. B at Appendix B p. ii, ¶ 2.[4]

21      **D.    ACF Builds on Industry Trends and Other Policies and Programs**

22      CARB designed ACF to build on other regulations and policies encouraging and/or

23  requiring deployment of ZEVs in the heavy-duty sector, as well as on the plans of vehicle and

24  engine manufacturers.  For example, ACF builds on CARB's Advanced Clean Trucks regulation

25  which requires that ZEVs make up increasing percentages of the medium- and heavy-duty

26  ───────────────
        [4] Exhibits B, C, D, E, and F are incorporated-by-reference in the Complaint.  *Khoja v.
27  Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1004 (9th Cir. 2018); *see* Compl. ¶¶ 58 (Exh. B),
    112–116, 222–223 (Exh. C), 122 (Exh. F), 180 (Exh. E), 193-195 (Exh. D).  And where the
28  "complaint incorrectly summarizes or characterizes" these documents, the documents themselves
    control.  *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1052 (9th Cir. 2023).

4

1  vehicles sold in California, beginning with the 2024 model year.  RJN Exh. A at 00012; *see also*

2  Cal. Code Regs., tit. 13, § 1963.1(b); ECF 1 (Compl.) ¶ 50.  EPA waived CAA preemption for

3  that addition to California's program, 88 Fed. Reg. 20,688 (Apr. 6, 2023), and the industry

4  reached compliance with the Advanced Clean Trucks' 2024 targets a year early, RJN Exh. G.

5        In fact, manufacturers sold 18,473 medium- and heavy-duty ZEVs in California in the 2023

6  model year—15% of all California sales.  RJN Exh. G.  In the prior year, manufacturers sold

7  7,427 medium- and heavy-duty ZEVs in California (or approximately 7% of total sales).  RJN

8  Exh F.  In other words, medium- and heavy-duty ZEV sales in California doubled in just one

9  year.  And that is true even for the heavy-duty tractors that pull trailers (often called "semis" or

10 "big rigs")—the vehicles Plaintiffs allege cannot be replaced with ZEVs.  *See*, *e.g.*, Compl. ¶¶

11 148–149, 150–51.  Manufacturers sold three times as many ZEV tractors in California in 2023 as

12 in 2022, even though no regulation required those sales.  RJN Exhs. F, G.

13       This acceleration in the deployment of ZEVs is supported, in part, by numerous financial

14 incentives for both vehicle purchases and charging infrastructure.  These programs include

15 California's Volkswagen Environmental Mitigation Trust and the resulting Beneficiary

16 Mitigation Plan for California, which "includes $90 million for ZE Class 8 freight and port

17 drayage trucks, with a maximum incentive of up to $200,000 per truck"; and funding programs

18 from California utilities, under the supervision of the California Public Utilities Commission, that

19 have provided or are providing "$1.8 billion supporting light-, medium-, and heavy-duty (on-road

20 and off-road) charging infrastructure development, including direct current fast charging."  RJN

21 Exh. A at 00046-52 (describing these and other programs).  In addition, Congress has

22 appropriated $1 billion for "clean heavy-duty vehicles" and directed EPA to award the funds to

23 cover, *inter alia*, "the incremental costs of replacing an eligible vehicle that is not a zero-emission

24 vehicle with a zero-emission vehicle" or "purchasing, installing, operating, and maintaining

25 infrastructure needed to charge, fuel, or maintain zero-emission vehicles."  42 U.S.C. § 7432(a),

26 (b).  Congress has separately provided federal tax credits of up to $40,000 per vehicle for

27 purchases of heavy-duty ZEVs.  26 U.S.C. § 45W.  As EPA recently put it, "[t]ens of billions of

28 dollars are being invested not only in these technologies, but also to increase the infrastructure

necessary for their successful deployment, including electric charging and hydrogen refueling infrastructure, manufacturing and production of batteries" and more.  89 Fed. Reg. 29,440, 29,442 (Apr. 22, 2024).

### E.    Procedural History

In November 2023, CARB requested a CAA Section 209(b)(1) preemption waiver from EPA.  RJN Exh. C.  In December, CARB indicated that it "will not take enforcement action as to the [ACF's] drayage or high-priority fleet reporting requirements or registration prohibitions" until EPA acts on CARB's request.  RJN Exh. D.  EPA has not yet acted on that request.

Plaintiffs filed their Complaint on April 1, 2024, challenging the Drayage and High-Priority Fleet Requirements (but no other components of ACF).  Compl. ¶¶ 17–18, 253(a), (b).  Defendants' waiver of service established a June 17, 2024 responsive pleading deadline.  ECF No. 7.  This Court has related this case to *California Trucking Association v. Cliff*, Case No. 2:23-cv-02333 and *Nebraska v. Cliff*, Case No. 2:24-cv-01364.  ECF Nos. 12, 17.

### LEGAL STANDARD

"The party asserting federal subject matter jurisdiction bears the burden of proving its existence."  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).  "In a facial attack" under Rule 12(b)(1), "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  By contrast, "[i]n resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint," and *"*[t]he court need not presume the truthfulness of the plaintiff's allegations."  *Id.*

Under Rule 12(b)(6), a complaint may fail "to state a claim to relief that is plausible on its face" by lacking either "a cognizable legal theory or … sufficient facts alleged under a cognizable legal theory."  *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016) (internal quotation marks omitted).  The Court must generally "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs," but need not "accept as true allegations that contradict matters properly subject to judicial notice" or "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Sci. Sec. Litig.*, 536 F.3d. 1049,

1  1055 (9th Cir. 2008) (internal quotation marks omitted).  Courts also "need not accept as true

2  legal conclusions couched as factual allegations." *Wilson v. Craver*, 994 F.3d 1085, 1090 (9th

3  Cir. 2021).  Dismissal without leave to amend is appropriate when deficiencies in the complaint

4  cannot be cured by amendment.  *See Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

5  **ARGUMENT**

6  **I.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR LACK OF STANDING**

7        Plaintiffs' entire complaint should be dismissed under Rule 12(b)(1) because the allegations

8  are insufficient to establish standing.  Plaintiffs rely on alleged injuries to their members,

9  asserting organizational standing.  Compl. ¶¶ 17–18.  Plaintiffs must therefore "make specific

10  allegations establishing that *at least one identified* member ha[s] suffered or would suffer harm."

11  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added).  "This requirement of

12  naming the affected members has … been dispensed with … only where *all* the members of the

13  organization are affected by the challenged activity." *Id.* at 498–99.  Yet Plaintiffs do not identify

14  a member who has been or will be injured by either the Drayage or High-Priority Fleet

15  Requirements.  Compl. ¶¶ 17–18.  Nor do they allege that *all* of Plaintiffs' members are or will be

16  injured. *Id.*  Plaintiffs have not alleged facts sufficient to support organizational standing.

17        Moreover, even if Plaintiffs could somehow avoid the Supreme Court's requirement to

18  identify at least one injured member, their allegations would still not establish standing for any

19  claims against the Drayage Requirements.  Plaintiffs must allege facts that, if proven, would

20  "demonstrate standing for each claim." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

21  But neither Plaintiff alleges that any of its members are regulated by the Drayage Requirements.

22  Compl. ¶¶ 17–18.  Plaintiffs thus face a "substantially more difficult" standing burden, *Lujan v.

23  Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation marks omitted), reflecting that "the

24  standing doctrine serves to protect the autonomy of those who are most directly affected so that

25  they can decide whether and how to challenge the defendant's action," *FDA v. All. for

26  Hippocratic Med.*, 602 U.S. --, 2024 WL 2964140, at *5 (June 13, 2024) (internal quotation

27  marks omitted).  Yet Plaintiffs allege only that unidentified members will experience unidentified

28  "economic harm" from the Drayage Requirements.  Compl. ¶¶ 17–18.  This conclusory allegation

7

1    does not plausibly support a conclusion that the fleets actually subject to the Drayage

2    Requirements will make "choices … in such manner as to produce causation and permit

3    redressability of [any] injury" to Plaintiffs' members.  *Lujan*, 504 U.S. at 562.

4         Plaintiffs may argue that they allege the price of drayage services will increase.  Compl.

5    ¶ 248.  But "the unavoidable uncertainty of the alleged future changes in price makes the alleged

6    injury insufficient for Article III standing."  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653

7    (9th Cir. 2017); *see also FDA*, 2024 WL 2964140, at *7 (Plaintiffs "must show that the third

8    parties will likely react in predictable ways that in turn will likely injure the plaintiffs.") (cleaned

9    up).  Plaintiffs' conclusory allegation that drayage fleets will supposedly be "compel[led]" to

10   raise the prices, Compl. ¶ 248, fails to account for the *gradual* phase-in of ZEVs, the massive

11   public and private investment in heavy-duty ZEVs and charging infrastructure, *supra* 5:13–6:3, or

12   the reduced maintenance and fuel costs of ZEVs which can, over time, offset higher purchase

13   prices, RJN Exh. A at 00019.  There simply are no allegations that could plausibly support a

14   conclusion that drayage fleets will respond to the gradual phase-in of ZEVs in a way that results

15   in "*certainly* impending" economic harm to Plaintiffs' members.  *Missouri*, 847 F.3d at 654

16   (internal quotation marks omitted).  In any event, Plaintiffs have not alleged that any of their

17   members actually hire drayage services.  Thus, even crediting the allegations of price increases,

18   the Complaint does not plausibly allege injuries to Plaintiffs' members.

19   **II.    PLAINTIFFS CANNOT STATE A CAA PREEMPTION CLAIM OVER WHICH THIS COURT**
20   **HAS JURISDICTION**

21        As described above, CARB has requested that EPA waive CAA Section 209(a) preemption

22   for the addition of ACF to California's motor vehicle emission program pursuant to CAA Section

23   209(b)(1).  42 U.S.C. § 7543(a), (b)(1).  This Court has no jurisdiction to address the question

24   Congress tasked EPA with answering.  *Id.*; *see also id.* § 7607(b).  And, given that CARB is not

25   taking action to enforce the relevant provisions of ACF until EPA acts on the pending waiver

26   request, there is also nothing for this Court to enjoin.  Compl. ¶ 194; RJN Exh D.

27        In fact, there is no Section 209(a) case or controversy for this Court to decide.  CARB

28   *agrees with Plaintiffs* that it "needs a preemption waiver to enforce the elements of ACF that

8

1   establish standards for new motor vehicles and new motor vehicle engines."  RJN Exh. E at 41.

2   The parties likewise agree that any provisions of ACF "that require drayage and [high-priority]

3   fleets to acquire (and therefore manufacturers to produce) new vehicles with particular emission-

4   control features"—such as new ZEVs—are unenforceable unless and until EPA waives Section

5   209(a) preemption.  RJN Exh. C at 20; *see also* Compl. ¶¶ 215–16, 219, 224–25.  There is also no

6   dispute that, at least "in the first few years of the ACF regulation's implementation," some

7   regulated fleets will have to acquire new ZEVs in order to comply with the Drayage and High-

8   Priority Fleet Requirements.  RJN Exh. C at 20; *see also* Compl. ¶¶ 210–11, 223.  This is one of

9   the reasons CARB requested a preemption waiver.  RJN Exh. C at 20.  Given these agreements

10  between the parties, there is "no actual controversy" under Section 209(a) for this Court to

11  resolve.  *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1074 (9th Cir. 2010).[5]

12       Attempting to plead around the absence of a Section 209(a) case or controversy, Plaintiffs

13  assert that the Drayage and High-Priority Fleet Requirements were void *ab initio* because they

14  were *adopted* before CARB had obtained a waiver.  Compl. ¶¶ 217, 220, 226.  According to

15  Plaintiffs, this means that a "waiver from EPA" can have "no operative effect" on Section 209(a)

16  preemption.  *Id.* ¶ 217; *see also id.* ¶¶ 220, 226.  That argument fails because the plain text of the

17  CAA gives EPA's waivers operative effect:  they "waive application of" Section 209 to

18  California.  42 U.S.C. § 7543(b)(1); *see also MEMA I*, 627 F.2d at 1107 (rejecting interpretation

19  that "would render the waiver provision … mere surplusage").  That argument also fails because

20  it runs contrary to EPA's "consistent[]" interpretation, under which the "waiver process

21  commences *after state regulatory adoption*," as it did here.  59 Fed. Reg. 36,969, 36,982 (July 20,

22  1994) (emphasis added).  EPA has codified this interpretation with respect to the analogous

23  provision for non-road vehicles and engines:  "California must request authorization from the

24           [5] At a minimum, Plaintiffs' facial preemption claim should be dismissed because they
25  have not alleged facts that could plausibly establish that every application of either the Drayage or
    High-Priority Fleet Requirements requires manufacturers to produce new ZEVs.  Specifically,
    Plaintiffs concede that if a fleet could comply by adding *used* ZEVs, ACF would not regulate *new*
26  motor vehicles and could not be preempted by Section 209(a).  Compl. ¶¶ 210–11, 214, 223–24.
    There are now hundreds of ZEV tractors and tens of thousands of other medium- and heavy-duty
27  ZEVs that have been sold in California.  *Supra* 5:5–12.  Plaintiffs have not alleged facts sufficient
    to support the conclusion that it would be impossible for any and all fleets to comply without
28  triggering CAA preemption—e.g., by acquiring used ZEVs.

9

1  Administrator to enforce its *adopted* standards."  40 C.F.R. § 1074.101(a)(1) (emphasis added);

2  *see also* 59 Fed. Reg. 36,969, 36,981-82 (July 20, 1994) (explaining interpretation).

3      Congress has also twice ratified EPA's interpretation.  When it amended the waiver

4  provision in 1977 (after a decade of EPA waiving preemption for already-adopted California

5  regulations), Congress "had an opportunity" to alter EPA's practice but declined to do so.  *MEMA*

6  *I*, 627 F.2d at 1110; *see* Pub.L. No. 95-95, § 207, 91 Stat. 685, 755 (1977).  That "failure to revise

7  or repeal the agency's interpretation is persuasive evidence that [EPA's] interpretation is the one

8  intended by Congress."  *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 275 (1974).

9  Then, in 1990, Congress "transplanted" the phrase "adopt or attempt to enforce" from Section

10  209(a) into the new Section 209(e), thereby bringing the "old soil" of EPA's interpretation into a

11  new context (regulation of nonroad vehicles and engines).  *Taggart v. Lorenzen*, 587 U.S. 554,

12  560 (2019); *see also* 42 U.S.C. § 7543(a), (e)(1), (e)(2)(A).  Plaintiffs' claim that the *adoption* of

13  ACF is preempted by Section 209(a) fails as a matter of law.[6]

14      Plaintiffs also assert that *if EPA grants a waiver*, CARB would still lack authority to

15  address ACF "violations that occurred before the waiver was granted."  Compl. ¶ 217.  These

16  allegations are "contingent upon two events:" (1) EPA's granting of the waiver for a period of

17  time preceding EPA's action; and (2) CARB's enforcement for ACF violations in that pre-

18  waiver-grant period.  *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009).  Because

19  "[i]t is possible that neither of the two events will occur," these allegations do not state a ripe

20  controversy.  *Id.*; *see also id.* at 1097 ("[U]nless and until contingent events occur, neither

21  Plaintiff will have suffered an injury that is concrete and particularized enough to survive the

22  standing/ripeness inquiry.").

23      Moreover, the temporal scope of any Section 209(b)(1) waiver is for *EPA* to determine in

24  the first instance.  42 U.S.C. § 7543(b)(1)(C); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d

25  449, 463 (D.C. Cir. 1998) (Section 209(b)(1)(C) requires "sufficient lead time to permit

26  manufacturers to develop and apply the necessary technology"); Compl. ¶ 27.  As this court has

27  _____

28  [6] To the extent Plaintiffs ask this Court for "retroactive relief" concerning CARB's August 2023 adoption of ACF, that would also "necessarily" run "afoul of the Eleventh Amendment."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (cleaned up).

1    previously put it, "the issue of … the required lead time for implementation of changes necessary

2    to comply with [CARB's new motor vehicle emission] regulations has been committed to the

3    EPA, not the courts." *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 563 F. Supp. 2d 1158, 1167

4    (E.D. Cal. 2008).  And if Plaintiffs disagree with any aspect of EPA's future decision (including

5    its temporal scope), that dispute will have to be brought to the Court of Appeals with original

6    jurisdiction.  42 U.S.C. § 7607(b)(1).  It cannot be resolved here.

7         Finally, Plaintiffs resort to arguing that the High-Priority Requirements "attempt[] to

8    enforce" other emission standards—CARB's low NOx standards, referred to as "Omnibus"—for

9    which CARB does not yet have a waiver.  Compl. ¶ 219.  This claim relies on ACF section

10   2015(r), *id.* ¶ 218, which states:  "Any new ICE [internal combustion engine] vehicle added to the

11   California fleet must be certified to applicable California emissions standards and emissions

12   related requirements," Cal. Code Regs., tit. 13, § 2015(r).  This is just more speculation.

13   Plaintiffs allege no facts suggesting that CARB will interpret the word "applicable" to include

14   emission standards for which it needs, but does not yet have, a preemption waiver.  Plaintiffs

15   likewise allege no facts that could support a conclusion that EPA will waive preemption for ACF

16   *before* it does so for the Omnibus standards.  In other words, it is entirely possible—even

17   accepting Plaintiffs' factual allegations as true—that Omnibus will be enforceable under a waiver

18   granted by EPA by the time EPA takes final action on the waiver concerning ACF.  Here, again,

19   Plaintiffs' purported claim rests on contingent events and the order in which they may (or may

20   not) occur.  *Bova*, 564 F.3d at 1096 (9th Cir. 2009).  Finally, the Complaint contains no facts that,

21   if proven, could establish an injury-in-fact from section 2015(r).  Plaintiffs allege that ACF

22   "orders" their members to "buy … trucks that use batteries *instead of internal-combustion*

23   *engines*" and that ACF "eliminate[s]" the option to purchase non-ZEVs.  Compl. ¶ 2 (emphasis

24   added).  Plaintiffs cannot plausibly claim their members are injured by limitations on the very

25   purchases Plaintiffs allege those same members cannot make.

26        Congress has tasked EPA with determining whether Section 209(a) preemption should be

27   waived.  Congress also made EPA's waiver decisions judicially reviewable only in the

28

1    appropriate court of appeals with original jurisdiction.  Plaintiffs' Complaint presents no Section

2    209(a) controversy for this Court to resolve, and this claim should be dismissed.

3    **III.    PLAINTIFFS CANNOT STATE A CLAIM FOR EISA PREEMPTION**

4         Plaintiffs also fail to state a claim that ACF's Drayage or High-Priority Fleet Requirements

5    are preempted by EISA (Pub. L. 110–140, 121 Stat. 1492 (Dec. 19, 2007)).  Plaintiffs allege only

6    implied—not express—preemption.  Compl. ¶ 228 (alleging "conflict" preemption); *id.* ¶ 243

7    (alleging "obstacle" preemption).  Indeed, Plaintiffs identify only one provision of EISA—49

8    U.S.C. § 32902(k)—and (correctly) do not assert it expressly preempts.  Compl. ¶¶ 228, 230.

9    Plaintiffs thus face the "high threshold" to establish that "a state law is to be preempted for

10   conflicting with the purposes of a federal Act."  *In re Volkswagen "Clean Diesel" Mktg., Sales*

11   *Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1206 (9th Cir. 2020) (internal quotation marks

12   omitted).  And, because "the regulation of air pollution for health and welfare purposes falls

13   within … even the most traditional concept of" state police power, this Court cannot find implied

14   preemption of this emission regulation "unless that was the clear and manifest purpose of

15   Congress."  *Id.* (internal quotation marks omitted).  Plaintiffs' claim fails as a matter of law

16   because Congress expressly stated precisely the opposite intent.

17        Plaintiffs rest their implied preemption claim on amendments EISA made to the federal

18   fuel-efficiency statute, requiring a "fuel efficiency improvement program" for medium- and

19   heavy-duty vehicles.  Pub. L. 110–140 § 102(b), 121 Stat. 1492, 1500 (2007); 49 U.S.C. §

20   32902(k)(2).  But Congress made clear that "nothing in [EISA]" has any preemptive effect

21   "[e]xcept to the extent *expressly provided* in this Act."  Pub. L. 110–140 § 3, 121 Stat. 1498

22   (emphasis added).  More recently, in the Inflation Reduction Act of 2022, Congress expressly

23   supported state laws requiring ZEV sales.  Pub. L. 117–169, tit. VI, Subtitle A, § 60105(g), 136

24   Stat. 1818, 2068–69 (2022) (authorizing "grants to States to adopt and implement greenhouse gas

25   and zero-emission standards for mobile sources").  Plaintiffs cannot state an implied preemption

26   claim in the face of Congress's express decision to foreclose such claims and support the

27   allegedly preempted state programs.  Rather, when, as here, "Congress has considered the issue of

28   pre-emption and has included in the enacted legislation a provision explicitly addressing that

12

1    issue," courts should not "infer congressional intent to pre-empt state laws from the substantive

2    provisions of the legislation." *Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1133 (9th Cir.

3    2003), *amended on denial of reh'g*, 350 F.3d 915 (9th Cir. 2003).[7]

4        Even if Plaintiffs could somehow overcome Congress's clear disavowal of implied

5    preemption and embrace of state ZEV standards, Plaintiffs' allegations do not and cannot identify

6    any "actual conflict" and, thus, cannot state a conflict preemption claim. *English v. Gen. Elec.*

7    *Co.*, 496 U.S. 72, 90 (1990). Congress itself recognized that regulations of vehicle emissions and

8    vehicle fuel-efficiency are distinct and can easily co-exist. It enacted two entirely different

9    statutes—to be implemented by different agencies—to govern these two fields. The "wholly

10   independent" programs established by the two statutes do not conflict simply because there may

11   be some "overlap" in the obligations they create. *Massachusetts v. EPA*, 549 U.S. 497, 532

12   (2007). Plaintiffs' suggestion that *any* emission regulation could conflict with the fuel-efficiency

13   statute because mandating lower emissions can be "equivalent to" mandating reduced fuel

14   consumption, Compl. ¶¶ 235–38, cannot be reconciled with Congress's judgment. Taken to its

15   logical conclusion, that amounts to an argument that Congress impliedly repealed some or all of

16   the CAA's vehicular emission programs—both EPA's and California's. There is no evidence in

17   EISA that Congress intended any such thing. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510

18   (2018) ("repeals by implication are disfavored") (cleaned up). To the contrary, Congress

19   expressly constrained EISA's preemptive effect. Pub. L. 110–140 § 3.

20       ACF does not conflict with the fuel-efficiency statute for the additional reason that it

21   requires the gradual phase-in of ZEVs—vehicles that do not consume "fuel," 49 U.S.C.

22   § 32901(a)(10), and have no "fuel economy," *id.* § 32901(11), within the meaning of that statute.

23

---

24       [7] There can be no doubt that state vehicle emission regulations are among the state laws
     for which Congress specifically intended to foreclose implied preemption challenges. The status
25   of such state regulations—including two recent decisions rejecting preemption challenges to state
     vehicle emission regulations—were front and center during the debates over EISA's enactment.
26   *See generally* Greg Dotson, State Authority to Regulate Mobile Source Greenhouse Gas
     Emissions, Part 2: A Legislative and Statutory History Assessment, 32 GEO. ENV'T L. REV. 625,
     631–42 (2020) (collecting legislative history materials); *see also Green Mountain Chrysler*
27   *Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 354, 398 (D. Vt. 2007) (rejecting express
     preemption under pre-EISA fuel-efficiency statute); *Cent. Valley Chrysler-Jeep v. Goldstene*, 529
28   F. Supp. 2d 1151, 1179 (E.D. Cal. 2007) (same).

1   Thus, the existing fuel-economy standards for vehicles like heavy-duty tractors "do not apply to

2   engines that are not internal combustion engines," 49 C.F.R. § 535.3(d)(7), and are based

3   exclusively on fuel-economy improvements feasible for *non-ZEV vehicles*, 81 Fed. Reg. 73,478,

4   73,497 (Oct. 25, 2016) ("none of these standards are based on projected utilization of … all-

5   electric vehicles [or] fuel cell vehicles").

6       Plaintiffs' entirely conclusory allegations of conflict do not begin to explain how a gradual

7   phase-in of vehicles that played no role in setting the fuel-efficiency standards create conflict with

8   those standards.  For example, Plaintiffs allege that ACF conflicts with determinations of cost-

9   effective levels of fuel-efficiency improvements made by the National Highway Traffic Safety

10  Administration (NHTSA).  Compl. ¶ 243.  But NHTSA's determinations concerned only non-

11  ZEVs.  81 Fed. Reg. at 73,497.  ACF has nothing to say about improvements manufacturers can

12  or should make to those vehicles.  Plaintiffs do not begin to explain how this creates conflict.

13      NHTSA's regulations do allow manufacturers to obtain credit toward compliance by

14  producing ZEVs, meaning that manufacturers who choose to produce such vehicles may opt to

15  make fewer improvements to their non-ZEVs.  *See* 81 Fed. Reg. at 73,497–98 (describing "credit

16  multipliers").  NHTSA's goal was "to create a meaningful incentive" for ZEV technologies.  *Id.*

17  at 73,497.  Nothing about that decision indicates that NHTSA, let alone Congress, "intended to

18  prevent states from making [ZEV use] mandatory."  *Chicanos Por La Causa, Inc. v. Napolitano*,

19  558 F.3d 856, 866–67 (9th Cir. 2009), *aff'd sub nom. Chamber of Com. of U.S. v. Whiting*, 563

20  U.S. 582 (2011).  "Congress could have, but did not, expressly forbid state laws from requiring"

21  ZEV production or use.  *Id.* at 867.  Instead, Congress has provided that EISA preemption is not

22  applicable except where expressly established; has supported, rather than expressly preempting,

23  state ZEV requirements; and has declined to include ZEVs in the set of vehicles that use "fuel"

24  and have "fuel economy."  Plaintiffs' EISA preemption claim fails as a matter of law.

25  **IV.   PLAINTIFFS CANNOT STATE A CLAIM FOR F4A PREEMPTION**

26      Plaintiffs also fail to state a claim under the F4A.  That statute preempts state laws "related

27  to a price, route, or service of any motor carrier … with respect to the transportation of property."

28  49 U.S.C. § 14051(c)(1).  The F4A does not displace California's power to set emissions

14

standards for motor vehicles (including heavy-duty trucks)—power expressly preserved in the CAA.  Moreover,  Plaintiffs bring a facial challenge to ACF, but the Complaint's allegations do not satisfy the *Salerno* test for facial preemption.  And, at best, Plaintiffs' allege that ACF has the kind of indirect effects on prices, routes, or services that courts have already held are too peripheral and remote to trigger F4A preemption.

### A.   The F4A Leaves Unchanged California's Ability to Regulate Motor Vehicle Emissions

As described above, Section 209(b)(1) of the Clean Air Act preserves California's authority to set emissions standards for new motor vehicles.  Congress enacted, and later strengthened, this provision, in part due to "the federal interest in allowing California to test new emissions regulations" and otherwise "continue innovating new solutions to automobile pollution."  *Ohio v. EPA*, 98 F.4th 288, 295 (D.C. Cir. 2024).  When Congress passed the F4A in 1994, California had been regulating truck emissions with Section 209(b)(1) preemption waivers for over two decades.  *E.g.*, 36 Fed. Reg. 8,172 (April 30, 1971).  Accordingly, by arguing that the F4A preempts ACF, even if EPA grants California a waiver allowing enforcement of the regulation, Plaintiffs take the position that the F4A partially repealed the CAA's waiver provision.  That argument fails.

"A party . . .  suggest[ing] that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention.'"  *BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*, 904 F.3d 755, 761 (9th Cir. 2018) (quoting *Epic Systems*, 138 S.Ct. at 1624).  In one recent case, the Ninth Circuit weighed a supposed conflict between a federal statute that preempts some railroad regulations, and an earlier-enacted federal statute that allows states to impose fees on transporting chemicals.  *Id.* at 758–59.  Rejecting the argument that the later, broader statute rolled back state authority expressly preserved by the earlier, narrower statute, the court explained that "[i]f Congress intended . . . to reverse course . . . one would expect Congress to have said so.  But Congress said nothing."  *Id.* at 766.  The same analysis forecloses Plaintiffs' F4A claim.

15

There is no sign in the F4A's text, structure or legislative history that Congress intended to change California's authority to set motor vehicle emissions standards—to impliedly repeal part of the CAA's waiver provision or otherwise "disrupt the balance of federal and state authority over pollution control that was established in the CAA." *CTA v. S. Coast Air Qual. Mgmt. Dist.*, No. 2:21-cv-06341, 2023 WL 9622548, *29 (C.D. Cal. Dec. 14, 2023).  The F4A's "silence on the pre-emption of state statutes that Congress previously sought to foster counsels against pre-emption here." *Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 332, n.7 (1997).  In fact, "[i]t is scarcely creditable that by enacting the [F4A] Congress would overturn all of [its] carefully crafted [CAA] handiwork without a mention." *Pleasant Hill Bayshore Disposal v. Chip-It Recycling*, 91 Cal. App. 4th 678, 691 (Cal. Ct. App. 2001); *see also AGG Enters. v. Washington Cnty.*, 281 F.3d 1324, 1330 (9th Cir. 2002) (describing *Pleasant Hill* as "persuasive").

In fact, Congress recently reaffirmed California's authority to control vehicle emissions by way of ZEV requirements, the F4A notwithstanding.  As noted above, the Inflation Reduction Act directs EPA "to provide grants to States to adopt and implement greenhouse gas *and zero-emission standards* for mobile sources pursuant to [S]ection 177 of the Clean Air Act."  Pub. L. 117-169, tit. VI, Subtitle A, § 60105(g), 136 Stat. 1818, 2068–69 (2022) (emphasis added).  States' authority under Section 177 is tied to EPA waiving preemption for California under Section 209(b)(1).  42 U.S.C. § 7507.  Thus, the Inflation Reduction Act underscores that California's authority to require ZEVs persists.

Plaintiffs' F4A claim runs headlong into the fact that "another federal statute … protects from preemption" the very law they seek to invalidate.  *BNSF Ry.*, 904 F.3d at 761.  Yet, the F4A and the CAA "are easily harmonized by reading § [209(b) of the CAA] to protect from preemption the [regulations] specifically authorized in that section."  *Id* at 762.

### B. Even Assuming Plaintiffs Are Not Categorically Barred from Claiming the F4A Preempts California Emissions Standards, Plaintiffs' Claim Still Fails

Even setting aside the imperative to harmonize the F4A with CAA Section 209(b), Plaintiffs fail to state an F4A claim.

16

### 1. Plaintiffs' allegations do not support a facial preemption claim

Plaintiffs present only a facial challenge to ACF.  Compl. ¶ 253 (seeking facial relief); *id.* ¶¶ 247–50 (alleging that ACF, not specific application of it, has unlawful effects).  But to succeed on a facial challenge, Plaintiffs need to "establish that every possible application of" a regulatory provision they challenge is preempted.  *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021).  Plaintiffs' allegations do not support that showing, and, in fact, many applications fall outside F4A's preemptive scope.  In particular, the F4A is "massively limit[ed]" in that it extends only to state laws concerning the "transportation of property."  *Dan's City Used Cars Inc. v. Pelkey*, 569 U.S. 251, 261 (2013).  But ACF covers trucking fleets that do not transport property.  For instance, the High-Priority Fleet Requirements apply to fleets of shuttle buses, service vans, wastewater vehicles, and more.  Cal. Code Regs. tit. 13, § 2015(b).  The F4A similarly does not apply to "intrastate transportation of household goods," 49 U.S.C. § 14501(c)(2)(B), but ACF covers fleets offering that service, Cal. Code Regs. tit. 13, § 2015(b).

Plaintiffs' facial challenge fails for a separate reason.  As ACF does not directly regulate prices, routes, or services, Plaintiffs' theory of F4A preemption is an indirect one: that ACF affects prices, routes or services.  *See, e.g.*, Compl. ¶¶ 246, 248–50.  Even assuming *arguendo* that ACF *could* have unlawful effects on some regulated fleets' prices, routes, or service, Plaintiffs do not and cannot allege that ACF will necessarily have such effects on *all* fleets to which it applies—regardless of their business models, routes, or available charging infrastructure.

### 2. Plaintiffs allege only indirect effects that are too peripheral to trigger preemption

Whether Plaintiffs' F4A claim is facial or as-applied, the allegations in the Complaint are insufficient to support it.  To state an F4A preemption claim under their indirect-effects theory, Plaintiffs would need to allege facts that, if proven, could plausibly establish that one or more provisions of ACF "compel[s] a [certain] result in a motor carrier's relationship with consumers, such as freezing into place a particular price, route or service that a carrier would otherwise not provide."  *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 659 (9th Cir. 2021).  And Plaintiffs must do so in the face of prior determinations that state laws regulating trucking companies'

17

"resource inputs"— such as "labor, capital, and technology"—often "have too 'remote' an effect on prices, routes, and services to be the intended target of preemption." *See Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 821–22 (3d Cir. 2019) (quoting *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012)).  In fact, the types of indirect effects Plaintiffs allege are no different than those the Ninth Circuit has several times rejected as insufficient to support F4A preemption, even in cases where the challenged laws might increase trucking companies' costs by as much as 75%.  *California Trucking Ass'n*, 996 F.3d at 660 (describing *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998)).  Similarly, district courts in California have now twice rejected F4A claims against emissions regulations, both times finding that the asserted effects were too remote to trigger preemption.  *California Dump Truck Owners Ass'n v. Nichols*, 2012 WL 273162, at *6 (E.D. Cal. Jan. 30, 2012) (denying motion for preliminary injunction)*; California Trucking Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 2023 WL 9622548, at *29 (C.D. Cal. Dec. 14, 2023). Plaintiffs do not allege any effects that could lead to a different result here.

To start, Plaintiffs' entirely conclusory allegation that ACF will "raise rates," Compl. ¶ 248, is insufficient.  The Complaint does contain allegations about the costs of ZEVs.  *E.g.*, Compl. ¶ 133.  But allegations of cost increases alone are not enough to support a claim for F4A preemption.  *Bedoya*, 914 F.3d at 821–22.  Plaintiffs notably offer no specific allegations about fleets' other costs, revenues, and corresponding pricing decisions.  Particularly since ACF requires that fleets phase in ZEVs over a period of upwards of 10 years, it is not enough to allege the cost of a single ZEV now.  Cal. Code Regs., tit. 13, § 2015.2(a) (requiring, *e.g.*, 10% of certain fleets to be ZEVs by 2027).  To state a claim, Plaintiffs would need to allege how incorporating ZEVs in fleets, over the extended time-horizon that ACF contemplates, will compel price increases that would give rise to preemption.  Plaintiffs have done nothing of the sort here.

Moreover, Plaintiffs' allegations about ZEV costs do not even account for the myriad state and federal grants, tax credits, and other subsidies available to defray upfront vehicle purchase costs as well as the costs to install charging infrastructure.  These include "significant and unprecedented monetary incentives for the production and purchase of qualified ZEVs" under the

18

1    Bipartisan Infrastructure Law and the Inflation Reduction Act.  89 Fed. Reg. at 29,445–46; *see*

2    *also id.* at 29,551; *supra* 5:13–6:3.  With allegations about costs that do not take available sources

3    of funding into account, Plaintiffs cannot plausibly support any impact of costs on prices, even if

4    such impacts could support a F4A preemption claim.

5            Plaintiffs' allegations about ACF's effects on routes are similarly deficient.  They allege

6    that ZEVs "have a substantially lower range and payload capacity, which will" lead to "more

7    trips, shorter trips, and refuel[ing] more often."  Compl. ¶ 250; *see also id.* at ¶ 159.  But a state

8    law is not preempted merely because it prompts "drivers [to] take longer to drive the same

9    distance, providing less service overall. . . . [T]hat argument equates to nothing more than a

10   modestly increased cost of doing business, which is not cause for preemption."  *Dilts v. Penske*

11   *Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014).  Plaintiffs also allege, in entirely conclusory

12   fashion, that ACF will cause "customers . . . to divert their routes to the few public charging

13   stations" available.  Compl. ¶ 75.  But the F4A does not shield trucking companies from having to

14   make "minor deviations from their routes."  *Dilts*, 769 F.3d at 649.  And fleets can continue to

15   use non-ZEVs, and indeed can consist of more than 50% non-ZEV trucks, past 2030.  Cal. Code

16   Regs. tit. 13, § 2015.2(a).  Thus, even if public charging stations are currently limited, Plaintiffs

17   have not alleged that will remain the case over the extended period of the ACF phase-in of ZEVs.

18   Nor could Plaintiffs plausibly do so, given the amount of public and private investment in

19   charging infrastructure.  *Supra* at 5:13–6:3.

20           Finally, Plaintiffs offer no allegations to substantiate a claim that any provision of ACF

21   unlawfully affects services.  Plaintiffs simply allege that ACF will result in "higher costs of . . .

22   services for consumers."  Compl. ¶ 249. But that is just another way of alleging that ACF may

23   affect prices.  The Complaint makes no allegations that ACF will compel or displace any specific

24   service, so no claim concerning the ACF's effect on services can survive.

25   **V.    THE ATTORNEY GENERAL SHOULD BE DISMISSED FROM ALL CLAIMS EXCEPT**

26   **        THOSE AGAINST THE DRAYAGE REQUIREMENTS**

27           Plaintiffs seek to utilize *Ex parte Young*'s limited exception to States' Eleventh Amendment

28   immunity, 209 U.S. 123, 155–56 (1908), but, for that exception to apply, the named "state

                                                           19

officer" defendants must have "some connection with the enforcement of the [challenged] act," *L.A. County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (cleaned up).  This connection "must be fairly direct" and the state official must have more than "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision."  *Id*.  The California Attorney General may have that connection to the Drayage Requirements because those can be enforced by "peace officers," Cal. Code Regs., tit. 13, § 2014.3, and the Attorney General is such a "peace officer," Cal. Penal Code § 830.1(b).  But the High-Priority Fleet Requirement provisions create no such connection, Cal. Code Regs., tit. 13, § 2015.6, and Plaintiffs allege no facts that could establish one, Compl. ¶ 20.  The Attorney General should be dismissed from any remaining challenges concerning provisions other than the Drayage Requirements.

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated:  June 17, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Defendants Steven S. Cliff and Rob Bonta, in their official capacities*

20